(No. 89910.—

## THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. LENARD JOHNSON, Appellant.

*Opinion filed December 19, 2002.*

RARICK, J., took no part.
KILBRIDE, J., dissenting.

Robert H. Farley, Jr., of Naperville, and Stephen E. Eberhardt, of Crestwood, for appellant.

James E. Ryan, Attorney General, of Springfield (Joel D. Bertocchi, Solicitor General, and William L. Browers and Jay Paul Hoffmann, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE GARMAN delivered the opinion of the court:

Petitioner, Lenard Johnson, pleaded guilty in 1990 to the murder of 11-year-old Donald Buske, the aggravated criminal sexual assaults of two female minors who were visitors at Donald's home, and home invasion. He waived a jury trial for sentencing. The circuit court of Montgomery County found three aggravating factors, concluded that there were no mitigating factors, and sentenced petitioner to death. Petitioner filed a late motion to withdraw his guilty plea, which the trial court heard upon the order of this court and denied. On direct appeal, this court affirmed the murder and sexual assault

convictions and corresponding sentences, but vacated the conviction and sentence for home invasion. See *People v. Johnson*, 154 Ill. 2d 356 (1993). Petitioner's petition for a writ of *certiorari* to the United States Supreme Court was denied. *Johnson v. Illinois*, 512 U.S. 1227, 129 L. Ed. 2d 848, 114 S. Ct. 2725 (1994).

Petitioner subsequently filed a petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122—1 *et seq.* (West 1994)). The circuit court dismissed several of his claims and denied others. Because petitioner was sentenced to death for the underlying convictions, his appeal lies directly to this court. 134 Ill. 2d R. 651(a). He raises five issues in this appeal: (1) whether he must be granted a new trial because, at the time he pleaded guilty, facts existed that would have raised a *bona fide* doubt as to his competence, (2) whether he received effective assistance of trial counsel because he had only one attorney and no mitigation specialist, (3) whether his court-appointed attorney was operating under a conflict of interest, (4) whether his death sentence is disproportionate to sentences imposed on similarly situated defendants, and (5) whether the death penalty statute is unconstitutional. For the reasons that follow, we affirm the judgment of the circuit court.

This court has previously described the facts underlying petitioner's conviction and sentencing in our opinion on his direct appeal. *Johnson*, 154 Ill. 2d 356. Thus, we will refer to those facts only as necessary in the discussion of the issues raised in petitioner's post-conviction petition. Because of the unusual procedural history of this case, however, a rather detailed summary of the post-conviction proceedings is necessary.

## POST-CONVICTION PROCEEDINGS

In 1995, petitioner filed a petition for post-conviction relief containing 15 separate claims plus a "catchall" claim, purporting to incorporate by reference all claims

made in his pretrial and post-trial motions and his direct appeal. The State filed a motion to dismiss pursuant to section 122—5 of the Act (725 ILCS 5/122—5 (West 1994)), arguing that all of the issues raised by petitioner either were or could have been raised on direct appeal and were, therefore, barred by waiver or *res judicata*. In addition, the State argued that petitioner had not presented any new evidence that would justify an evidentiary hearing.

After a hearing on January 26, 1996, the circuit court granted the State's motion, in part, dismissing all but five of petitioner's original 16 claims and directing the State to file an answer to the remaining claims, enumerated I, II, III, X, and XV. The State apparently filed its answer on March 1, 1996. The table of contents provided with the record indicates that the State's answer is to be found at page 812 of the common law record. Pages 812 and 813 are missing, so we are unable to determine how the State answered the five claims that survived the motion to dismiss.

On May 23, 1997, petitioner filed a supplement to his petition, adding two additional claims, numbered XVII and XVIII. At all times relevant to this matter, the Act has specifically prohibited the filing of further pleadings after the circuit court has ruled on a motion to dismiss. 725 ILCS 5/122—5 (West 1994, 1996, 1998) (after denial of motion to dismiss and filing of an answer by the State, "[n]o other or further pleadings shall be filed except as the court may order on its own motion or on that of either party"). The record does not contain a motion by petitioner seeking leave to supplement his petition with two additional claims after the circuit court ruled on the State's first motion to dismiss. However, the State did not challenge petitioner's filing of additional pleadings. Instead, the State filed a second motion to dismiss, which was denied after a hearing on March 17, 1998. The State

then filed an answer, denying the allegations contained in both of the new claims. Thereafter, the State apparently sought leave to file a motion for summary judgment. The record contains an April 9, 1998, docket entry with the notation "Confer[ence] call w/o record. SA to file Motion for Summ. Jmt. by 5/4/98 at 4 p.m."

On May 4, 1998, the State filed a "Motion for Summary Judgment" in which it argued that the two claims raised in the supplemental petition could be resolved by the circuit court based entirely on its examination of the record and that, therefore, an evidentiary hearing would not be necessary. The motion, however, neither cited section 2—1005 of the Code of Civil Procedure (735 ILCS 5/2—1005(c) (West 1998)), nor requested that judgment be entered for the State as a matter of law.

On June 19, 2000, the circuit court heard arguments on the State's motion for summary judgment and denied it, thereby indicating its determination that two newly added claims could not be resolved purely as a matter of law. Immediately thereafter, the circuit court heard arguments on the merits of all seven of the pending claims, the five that survived the State's original motion to dismiss and the two claims raised in the supplemental petition. Petitioner describes this as a "stipulated hearing," because no testimony was presented.

The circuit court based its ruling on the record as it stood on June 19, 2000, including the transcripts of the original proceedings, the deposition of trial counsel, David Grigsby, which had been taken on November 4, 1998, the 1995 report of mitigation specialist Jeffrey Eno, and the reports of four mental health professionals who examined petitioner at various times. Psychiatrist M. Scott Hamilton examined him in 1990, prior to his pleading guilty. Psychiatrist Philipp E. Bornstein apparently examined petitioner prior to the entry of his plea, but did not provide a written report until several days thereafter.

Clinical psychologist Mark Ramsden evaluated him after his conviction and sentencing, but prior to a hearing on his late motion to withdraw his guilty plea. In addition, clinical psychologist Michael M. Gelbort evaluated petitioner on April 8, 1999. Both the Grigsby affidavit and the Gelbort evaluation were made part of the record after the circuit court denied the State's motions to dismiss. At the conclusion of the hearing, the circuit court denied the seven remaining counts of the petition.

## ANALYSIS

The Act provides a remedy to a criminal defendant whose federal or state constitutional rights were substantially violated in his original trial or sentencing hearing. *People v. Towns*, 182 Ill. 2d 491, 502 (1998). A petition for post-conviction relief is not an appeal of the underlying judgment; rather, it is a collateral proceeding. *Towns*, 182 Ill. 2d at 502. As such, a post-conviction proceeding allows inquiry only into constitutional issues that were not, and could not have been, adjudicated on direct appeal. *Towns*, 182 Ill. 2d at 502. Thus, issues that were raised and decided on direct appeal are barred from consideration by the doctrine of *res judicata*; issues that could have been raised, but were not, are considered waived. *Towns*, 182 Ill. 2d at 502-03.

Post-conviction proceedings in capital cases are governed by section 122.2—1(b) of the Act (725 ILCS 5/122.2—1(b) (West 1994)), which requires the circuit court to determine initially "whether the petitioner, if indigent, wants to be represented by counsel. After the petitioner makes that choice, the matter is then docketed for further proceedings." *People v. Thomas*, 195 Ill. 2d 37, 40 (2001). The State must then either answer the petition or move to dismiss it. 725 ILCS 5/122—5 (West 1994); *Thomas*, 195 Ill. 2d at 40. If the State moves to dismiss the petition, the circuit court must examine and rule on the legal sufficiency of each of defendant's claims,

taking all well-pleaded facts as true. *People v. Ward*, 187 Ill. 2d 249, 255 (1999). If the allegations of the post-conviction petition, supported by the trial record and any accompanying affidavits, do not make a substantial showing of a constitutional violation, the petition may be dismissed. *People v. Orange*, 195 Ill. 2d 437, 448 (2001). If the petition does make a substantial showing of a constitutional violation, the matter proceeds to a hearing on the merits of petitioner's claims. *People v. Hobley*, 182 Ill. 2d 404, 428 (1998).

Our detailed recitation of the various stages of this matter before the circuit court is necessary to our determination of the standard of review. Both parties suggest *de novo* review, citing *People v. Coleman*, 183 Ill. 2d 366, 378-89 (1998), in which this court determined that plenary review is appropriate when the circuit court has granted the State's motion to dismiss based on its determination that the allegations in a post-conviction petition are insufficient to demonstrate a constitutional deprivation that entitles the petitioner to relief under the Act. The lengthy explanation of the standard of review in *Coleman* has since been reduced to a simple formula: *de novo* review for the dismissal of post-conviction petition without an evidentiary hearing and review for manifest error when petitioner's constitutional claims were denied following an evidentiary hearing. See, e.g., *People v. Pitsonbarger*, 205 Ill. 2d 444, 456 (2002); *People v. Topps*, 309 Ill. App. 3d 813, 819 (1999).

In the present case, the parties agree that there was no "evidentiary hearing." Petitioner describes the hearing that took place after the State's motion for summary judgment was denied as a "stipulated hearing." The Act, however, does not mention a "stipulated hearing." Indeed, the words "evidentiary hearing" do not appear in the Act. Rather, the Act provides that if the petition is not dismissed pursuant to section 122—2.1, "the court

shall order the petition to be docketed for further consideration in accordance with Sections 122—4 through 122—6." 725 ILCS 5/122—2.1(b) (West 1994). Section 122—6 governs such "further consideration." Under this provision, the circuit court "may receive proof by affidavits, depositions, oral testimony, or other evidence." 725 ILCS 5/122—6 (West 1994).

Black's Law Dictionary defines "hearing" as a "judicial session usu[ally] open to the public, held for the purpose of deciding issues of fact or of law, sometimes with witnesses testifying." Black's Law Dictionary 725 (7th ed. 1999). The more specific term "evidentiary hearing" is a "hearing at which evidence is presented, as opposed to a hearing at which only legal argument is presented." Black's Law Dictionary 725 (7th ed. 1999). It is the section 122—6 hearing that has come to be called an "evidentiary hearing."

The circuit court declined to dispose of seven of petitioner's claims as a matter of law by initially denying the State's motion to dismiss 5 of the 16 original claims and then subsequently rejecting the State's motion to dismiss and its motion for summary judgment as to the two additional claims. At the June 19, 2000, hearing, the circuit court, having previously found that each of these seven claims did make a substantial showing of a violation of a constitutional right, allowed the parties to address each claim on the merits. Thus, this proceeding was a section 122—6 hearing even though no live testimony was presented.

The question that we must resolve is whether *de novo* review is appropriate where no new evidence was presented at the section 122—6 hearing that would require the circuit court to assess the credibility of witnesses. We recently addressed a similar question in *People v. Caballero*, 206 Ill. 2d 65, 87-88 (2002), where the circuit court, at the section 122—6 hearing, heard argument

based on the record, but did not hear testimony. We concluded:

"The *de novo* standard of review is applicable when the issue presented is purely a question of law. *People v. Chapman*, 194 Ill. 2d 186, 217 (2000) (stating that *de novo* review is appropriate when there are no factual or credibility disputes and the appeal, therefore, 'involves a pure question of law'); see also *People v. Hall*, 195 Ill. 2d 1, 21 (2000) (stating that *de novo* review is applicable to questions of statutory interpretation or other questions of law). In *Hall*, the defendant urged *de novo* review because the rulings at issue 'involved no fact-finding based on the demeanor or credibility of the witnesses because the evidence was written.' *Hall*, 195 Ill. 2d at 21. We rejected this argument because the issue presented, whether certain evidence should have been admitted at trial, was not a pure question of law. Some deference was due to the trial court's rulings because 'the trial court exercised discretion \*\*\*, *i.e.*, the court based these rulings on the specific circumstances of this case and not on a broadly applicable rule.' *Hall*, 195 Ill. 2d at 21."

Although the circuit court in *Caballero* heard no new evidence and credibility of witnesses was not a concern, the circuit court did have to weigh the facts and make inferences therefrom in order to rule on "the specific circumstances" of the case. Nevertheless, we applied a *de novo* standard of review because, given the fact that more than a decade had passed between the trial and the post-conviction proceeding, the circuit court had no special expertise or familiarity with the case that would have made it more capable than this court of weighing the facts presented by the written record and drawing necessary inferences.

In *Coleman*, we observed that the "proper standard of review cannot be articulated without first examining the substantive and procedural backdrop against which the appealed order or ruling arose." *Coleman*, 183 Ill. 2d at 378. Thus, in determining the standard of review, we consider not only the procedural posture (whether the

circuit court was ruling on a motion to dismiss or after a section 122—6 hearing), but the nature of the question (whether it is a pure question of law or a question of fact), and the degree to which the court must assess credibility, weigh facts, and draw inferences.

In the present case, we will review *de novo* those claims dismissed by the circuit court in response to the State's first motion to dismiss. *Coleman*, 183 Ill. 2d at 388-89. These are his conflict of interest argument (claim XI in petitioner's original petition and point III in his current brief) and his various arguments about the constitutionality of the death penalty statute (claims IV, V, VI, VII, VIII, IX, and XIII in his original petition and point V in his current brief).

Petitioner's point IV, regarding similarly situated defendants, is an amalgam of his original claims X and XIV, one of which was dismissed and one of which was denied after the section 122—6 hearing. Because this issue is one that can be resolved as a matter of law, without the need to consider the specific circumstances of this case, we review it *de novo*. *Hall*, 195 Ill. 2d at 21.

As to the claims denied following the section 122—6 hearing, we will give some deference to the circuit court in acknowledgment of its familiarity with petitioner's case and particularly with the professional performance of trial counsel. We, therefore, review petitioner's arguments regarding his fitness to plead guilty (point I) and the performance of trial counsel (point II) for manifest error. Manifest error is that which is "clearly evident, plain, and indisputable." *People v. Ruiz*, 177 Ill. 2d 368, 384-85 (1997).

## I. Fitness to Plead Guilty

Although not set out as separate arguments within petitioner's brief, his fitness claim offers two distinct rationales. First, petitioner makes statements suggesting that the trial court actually had a *bona fide* doubt as to

his fitness and, thus, should have conducted a hearing to determine his capacity to enter a knowing and voluntary plea. Second, even if the trial court's comments do not reflect an actual doubt as to his fitness, he argues that he has produced new evidence that would have raised a *bona fide* doubt if it had been available to the trial court. He further argues that trial counsel was ineffective for failing to request a fitness hearing and appellate counsel was ineffective for failing to raise this issue on direct appeal. He asserts that, had either trial or appellate counsel performed effectively, there is a reasonable probability the outcome of the proceedings would have been different.

The due process clause of the United States Constitution (U.S. Const., amend. XIV) prohibits the conviction and sentencing of a person who is incompetent to stand trial. See *Drope v. Missouri*, 420 U.S. 162, 172, 43 L. Ed. 2d 103, 113, 95 S. Ct. 896, 904 (1975); *People v. Mitchell*, 189 Ill. 2d 312, 328-29 (2000). Our state statutes have long contained provisions designed to safeguard this right (see 725 ILCS 5/104—10 *et seq.* (West 2000)). This statutory scheme has been held to adequately protect a defendant's due process right to be prosecuted only when fit to stand trial. *Mitchell*, 189 Ill. 2d at 328-29. By statute, a defendant is "presumed to be fit to stand trial or to plead, and be sentenced." Ill. Rev. Stat. 1989, ch. 38, par. 104—10. However, when a *bona fide* doubt of the defendant's fitness exists, the court must order a fitness hearing so that the question of fitness may be resolved before the matter proceeds any further. Ill. Rev. Stat. 1989, ch. 38, par. 104—11(a). Once a *bona fide* doubt is demonstrated, the State has the burden of proving, by a preponderance of the evidence, that the defendant is fit. Ill. Rev. Stat. 1989, ch. 38, par. 104—11(c). A defendant is fit to stand trial, plead, or be sentenced if he is able to understand the nature and purpose of the proceedings

against him and to assist in his defense. Ill. Rev. Stat. 1989, ch. 38, par. 104—10.

### A. Actual Doubt

The argument that the trial court had actual doubts as to petitioner's fitness to plead guilty was available to him at trial and on direct appeal. It is, therefore, subject to waiver. However, the doctrine of waiver will be relaxed where the alleged waiver results from the incompetence of appellate counsel. *People v. Mahaffey,* 194 Ill. 2d 154, 171 (2000). To avoid application of the doctrine of waiver, petitioner argues that appellate counsel was ineffective for failing to argue, first, that the trial court failed to carry out its duty to *sua sponte* hold a fitness hearing and, second, that trial counsel failed to recognize the trial court's actual doubts as to his fitness and to request a fitness hearing based on those actual doubts.

To prevail on a claim of ineffective assistance of counsel, a petitioner must show both that: (1) counsel's representation was so deficient as to fall below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance so prejudiced defendant as to deny him a fair trial. *Strickland v. Washington,* 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). With regard to the performance of trial counsel, this means the petitioner must show that counsel's errors were so serious, and his performance so deficient, that he did not function as the "counsel" guaranteed by the sixth amendment. In addition, petitioner must prove there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *People v. Whitehead,* 169 Ill. 2d 355, 380-81 (1996). As applied to a claim that appellate counsel was ineffective for failing to raise the issue of ineffectiveness of trial counsel, the defendant must show that the failure to raise the issue was objectively unreasonable and that, but for this

failure, a reasonable probability exists that his sentence or conviction would have been reversed. *Whitehead*, 169 Ill. 2d at 381. If either prong of the *Strickland* test is not met, petitioner's claim must fail. *Whitehead*, 169 Ill. 2d at 380-81.

As evidence of an actual *bona fide* doubt of his fitness, petitioner points to several instances in the record where the trial court expressed concern regarding his ability to understand the proceedings. At the arraignment hearing on June 4, 1990, the trial court, after granting the defense motion for a psychiatric evaluation, questioned petitioner: "Do you believe you understand what it is that you are charged with in each of these six Bills of Indictment, Mr. Johnson?" "Do you believe you understand what the possible penalties can be in the event that you plead guilty or are found guilty of any or all of these Indictments?" "Do you believe you understand what your rights are?" After petitioner answered each of these questions in the affirmative, the trial court turned to defense counsel: "Do you believe he understands, Mr. Grigsby?" Defense counsel replied, "Yes, I do, Your Honor." This same sort of exchange—the trial court's questioning of the defendant, the defendant's affirmative answer, and verification by defense counsel—occurred repeatedly at this hearing.

Petitioner first attempted to plead guilty at a hearing on August 20, 1990. Defense counsel informed the trial court that the first psychiatric examination showed petitioner to be fit for trial. After several motions were disposed of, defense counsel informed the court that petitioner wished to plead guilty. The trial court questioned him about his discussions with counsel. He stated that he had received adequate advice. The trial court admonished him that he could be sentenced to death if he pleaded guilty. Petitioner stated that he understood. The trial court concluded the hearing with the remark,

"Mr. Johnson, I would like you to take some time to further consider whether or not that is what you want to do in this case. I want you to consider it very seriously, sir."

A hearing was held on September 7, 1990, for the purpose of entry of petitioner's guilty plea. After defense counsel withdrew several pending motions at petitioner's request, including the request for a second psychiatric examination, the trial court commented on counsel's duty "not to proceed in motions where your client, in the exercise of competent judgment, has indicated that you ought not." The trial court further stated:

> "[I]f there is some question concerning the defendant's competency, that is a matter which counsel has an obligation to bring to the attention of the Court by way of motion seeking full expiration [sic] of that matter, irrespective of defendant's wishes. I have seen nothing in Mr. Johnson's conduct before this Court that leads me to think that there is any question concerning his competence. There is nothing in the reports of the psychiatrist that was appointed at your request on his behalf which leads me to think that there is any question concerning his competence and ability to proceed here in this case. But if you, as an officer of this court, have any questions, then I believe it is incumbent upon you to request an additional examination."

The trial court asked counsel directly whether he had any doubts regarding his client's competence and counsel responded that he had "always found [petitioner] competent and able to talk about the case and his wishes." Petitioner's guilty plea was not accepted at that time, however, because he disputed the factual basis presented by the State. During the delay between this hearing and the actual entry of his guilty plea, petitioner was evaluated by a second psychiatrist who also found him fit for trial.

Petitioner points to such comments as evidence that the trial court had actual doubts about his fitness. We do not understand petitioner to be accusing the trial court

of being untruthful when it stated that it had observed no evidence of unfitness. Rather, petitioner seems to be arguing that the trial court's comments reflect sufficient uncertainty about his fitness to trigger the court's duty to order a fitness determination. See *People v. Mitchell*, 189 Ill. 2d 312, 367 (2000); 725 ILCS 5/104—10 (West 1996). The State interprets the same comments as the trial court's merely taking care to protect a defendant's rights.

The record supports the State's position. Given the circumstances, including petitioner's apparent suicide attempt at the time of his arrest, the trial court was attuned to the possibility that his mental state was less than stable. The trial court granted the motion for a psychiatric evaluation, which revealed petitioner to be fit for trial. In addition to questioning defense counsel repeatedly about his client's mental state, the trial court expressly reminded counsel of his duty to raise the fitness issue if indeed he had any doubts as to his client's condition. Even after petitioner's insistence that he did not desire a second psychiatric evaluation, the trial court ordered it done. It, too, revealed that petitioner was fit. Finally, nothing in petitioner's demeanor or conduct during the proceedings would have raised an actual *bona fide* doubt in the trial court's mind. The trial court repeatedly questioned petitioner and received answers that demonstrated his understanding of the nature and purpose of the proceedings. His ability to assist in his own defense was demonstrated by his withdrawing his initial guilty plea when he disputed the State's proffered factual basis. Later, when he was satisfied with the State's recitation of the facts of his crime, he did enter a guilty plea.

We, therefore, reject petitioner's claim that the trial court held an actual *bona fide* doubt of his fitness for trial but neglected to conduct a fitness hearing. Thus, we

find no manifest error in the circuit court's denial of petitioner's claim that appellate counsel was ineffective for failing to raise this issue on direct appeal.

## B. *New Evidence*

The second part of petitioner's fitness claim is that new evidence, in the form of Ramsden's report and defense counsel Grigsby's deposition, reveals the existence of certain facts, which existed at the time he pleaded guilty, and which, had they been known to the trial court, would have raised a *bona fide* doubt as to his fitness. He argues that the existence of these facts is sufficient to put the burden on the State to prove him fit. See Ill. Rev. Stat. 1989, ch. 38, par. 104—11(c).

Although, at trial, the existence of a *bona fide* doubt as to fitness imposes the burden of proof on the State, the burden in the present case is on petitioner. He is entitled to post-conviction relief "only if he shows that the trial court would have found a bona fide doubt of his fitness and ordered a fitness hearing if it had been apprised of the evidence now offered." *People v. Easley*, 192 Ill. 2d 307, 319 (2000).

The State urges us not to consider the reports of Ramsden and Gelbort and other evidence developed after the trial court accepted petitioner's guilty plea, citing *People v. Franklin*, 48 Ill. 2d 254 (1971), and *People v. Wilson*, 29 Ill. 2d 82 (1963). These cases do not support the State's contention. In *Franklin*, we rejected the defendant's argument that the mere fact the trial court ordered an examination by a behavior clinic demonstrated a *bona fide* doubt as to his fitness. *Franklin*, 48 Ill. 2d at 256-57. In *Wilson*, the defendant claimed that his guilty plea was coerced, in part, because the trial court denied his motion for a "sanity hearing." We affirmed because, although defense counsel did request a fitness hearing, he did not present any factual basis to justify his request. Thus, the trial court did not err in

denying the requested examination and hearing. *Wilson*, 29 Ill. 2d at 93-94. Neither of these cases speak to the present situation.

In *People v. Harris*, 206 Ill. 2d 293, 302 (2002), the defendant argued that a *bona fide* doubt of his fitness existed at the time of his trial because he suffered from depression, a personality disorder, and organic brain damage. The State argued that he had waived any argument that trial counsel was ineffective for failing to seek a fitness hearing by failing to raise it on direct appeal. Because the defendant's argument was based on evidence outside the record, however, we determined that the claim should be considered on the merits. *Harris*, 206 Ill. 2d at 303. To establish the prejudice prong of the *Strickland* test, a defendant must show that the facts that would have raised a *bona fide* doubt of his fitness for trial existed at the time of his trial, but those facts need not actually have been known to the court or counsel. *Harris*, 206 Ill. 2d at 304; *People v. Easley*, 192 Ill. 2d 307, 319 (2000). We, therefore, reject the State's suggestion that the new evidence offered by petitioner should not be considered on post-conviction review.

The new evidence includes the deposition of trial counsel, Grigsby, and the report of the clinical psychologist, Gelbort. In addition, the record contains information that is not new to this post-conviction proceeding, but that was not available to the trial court when it accepted petitioner's guilty plea. This includes his mother's testimony at the sentencing hearing regarding his history of mental illness and the report of the clinical psychologist, Ramsden, who testified at the hearing on petitioner's motion to withdraw his guilty plea. All of the evidence developed after he pleaded guilty, when considered in combination with the information known to the trial court at the time, is, according to petitioner, sufficient to raise a *bona fide* doubt of his fitness to stand trial or to enter a knowing and intelligent guilty plea.

Grigsby stated that he had been a public defender for approximately four years prior to being appointed to represent petitioner. He previously had defended one other capital defendant, who also pleaded guilty and waived a jury for sentencing. Grigsby recalled that petitioner chose to be sentenced by the judge because he did not want the facts of his crimes revealed to a jury. In addition, petitioner wanted to be sentenced to death and thought that the judge would be more likely to impose the death penalty. Petitioner requested that, at the sentencing stage, Grigsby not put on any evidence of mitigating factors. Grigsby thought that petitioner wanted to plead guilty and have a bench sentencing so that he could "get it over with" as quickly as possible.

Gelbort, in 1999, found petitioner to display "a pattern of internal psychological functioning typically associated with post-traumatic stress disorder," but found "no overt psychopathology." Gelbort concluded that petitioner was mildly impaired intellectually and that his most prominent limitation is his visual defect. Gelbort also found that petitioner demonstrated "organic brain dysfunction" that affects his cognitive ability and that "[h]istorical information supports the finding that these deficits have been present since before the time of the event for which he is incarcerated."

Ramsden tested and interviewed petitioner after he was sentenced to death, but before the hearing on his motion to withdraw his guilty plea. His diagnosis was major depression and dysthymia. Ramsden concluded that petitioner "appreciated the wrongfulness of his actions, understood the consequences of his behavior and was most probably not psychotic." However:

> "[His] suicidal behavior at the time of his arrest and his reported unwillingness to participate in a meaningful defense prior to his conviction support the contention that this was a period of time where he was experiencing an acute exacerbation of his depressive disorder. The extreme

psychological distress experienced during these periods significantly influenced and impaired his ability to determine what actions, statements and behaviors were in his best interests. In this light, it is difficult to characterize his behavior at that time as either completely knowing or completely voluntary. He was driven at that time by his depressive beliefs that exploitation, ruin and punishment were the inevitable conclusions of his life and that nothing he could do would change that outcome."

Petitioner argues that this new information, when considered in conjunction with the facts known at the time of his guilty plea and those that were revealed at his sentencing hearing, create a *bona fide* doubt of his fitness.

At the time it accepted his guilty plea, the trial court was aware that when the police arrived at the crime scene while his attack on the girls was still in progress, petitioner attempted to kill himself by slitting his own wrist and throat. Later, when he was interviewed in the hospital by a police officer, he claimed that his body had been present when the murder and sexual assaults took place, but not his mind. He begged another officer to shoot him. Petitioner also relies on his mother's testimony at the mitigation stage of his sentencing hearing regarding his history of psychiatric treatment, beginning in adolescence, and her opinion that he had always been "mentally unbalanced."

The State replies that the two contemporaneous psychiatric evaluations more accurately reveal petitioner's mental state at the time he pleaded guilty. Dr. Hamilton examined petitioner in July 1990. He diagnosed pedophilia, chronic depression, and antisocial personality traits. He concluded, however, that petitioner did "not meet the criteria for major depression," nor did psychological testing reveal any "evidence of psychosis or organic mental syndrome." With regard to petitioner's fitness to stand trial, Hamilton found that he knew what he was charged with, knew who his lawyer was, and was

aware of potential penalties. He understood his lawyer's role and the roles of the judge and prosecutor. Hamilton concluded that petitioner was "capable of appropriate behavior in the courtroom" and competent to testify if he chose. Hamilton stated that petitioner was "not motivated to assist his lawyer in his own defense. This seems largely out of a feeling of guilt. Although this lack of motivation would certainly make him difficult to defend, I do not see this impairment as a product of mental illness."

Dr. Bornstein diagnosed petitioner with antisocial personality, pedophilia, chronic alcoholism, possible mild chemical dependency, and mild dysthymia. He found "no evidence for any psychiatric disorder which is characterized by psychosis, organic brain disease, or mental retardation." Bornstein concluded that petitioner had no psychiatric disorder that rendered him unfit for trial.

The State also points to the many instances in the record of the original proceedings where the trial court asked defense counsel about petitioner's mental state and defense counsel repeatedly stated that petitioner understood the proceedings and was communicating with counsel. In addition, the transcripts reveal numerous exchanges between the trial court and petitioner in which he demonstrated his awareness of the proceedings and his ability to participate.

With regard to the Ramsden report and opinion, the State notes that Ramsden expressed no opinion on petitioner's fitness. Rather, Ramsden was asked to address petitioner's claim that his guilty plea was not knowing and voluntary, not his fitness for trial. Indeed, Ramsden's findings support a finding of fitness. Ramsden stated that petitioner was alert and oriented to time, place, and situation; he demonstrated adequate attention and concentration; he was of at least normal intelligence; his memory was intact; and his speech was coherent and

relevant. Except for his visual impairment, Ramsden found that petitioner displayed no significant signs of organic impairment or disability. All of these findings suggest that petitioner was able to understand the nature and purpose of the proceedings and to assist in his defense if he chose to do so.

Similarly, the State points out that Gelbort found petitioner's intellectual impairments to be "subtle and mild." Gelbort expressed no opinion about petitioner's fitness at the time he pleaded guilty, and no statement that his mild mental deficits would have affected his ability to understand the proceedings or assist counsel.

Petitioner has cited no comparable cases in which a defendant has been granted post-conviction relief based on similar facts. Our own research has revealed several informative cases. In *Harris*, we noted that even "[t]aking as true defendant's allegations that he suffers from mental impairments as they are stated in his post-conviction psychological assessments [citation], these allegations do not necessarily establish that defendant was unfit." *Harris*, 206 Ill. 2d at 305. Instead, we focused on the defendant's ability to function in the context of a trial, not on his sanity or competence in other areas. We concluded that the record clearly indicated defendant's understanding of the nature and purpose of the proceedings:

"On several occasions, the court provided defendant with a detailed explanation of the proceedings and informed defendant of his rights during those proceedings. Following these admonishments, defendant stated that he understood. Furthermore, the record shows that defendant participated in his own defense; communicated and conferred with his trial counsel; expressed to the court his understanding of the proceedings, including his decision to litigate rather than agree to a plea, waive his right to testify, and waive his right to a jury at the sentencing hearing; and articulated a clear statement in allocution during mitigation." *Harris*, 206 Ill. 2d at 305.

In the present case, petitioner participated in similar exchanges with the trial court during which he demonstrated his understanding of the proceedings. His own statements and those of counsel reveal that he communicated and conferred with counsel. His decision to enter a guilty plea was contingent on the State's offering a version of the facts that he was willing to accept. We conclude, as we did in *Harris*, that the record clearly indicates petitioner's understanding of the proceedings and his ability to participate when he chose to do so. See also *People v. Haynes*, 192 Ill. 2d 437, 474-75 (2000) (rejecting defendant's post-conviction claim based upon records of psychiatric illness predating his crime where, at the time of trial, the evaluating psychiatrist found defendant fit for trial and also capable of choosing not to cooperate with his attorney).

In *Easley*, we considered the results of psychological examinations conducted after the defendant's conviction as they related to his fitness at the time of trial. These examinations, conducted six years after the trial, indicated that the defendant had "long-standing mental problems at the time of trial that affected his ability to understand written and oral instructions." *Easley*, 192 Ill. 2d at 322. In addition, at times of extreme stress, the defendant suffered from "thought and personality disorder, paranoia, and episodic breaks with reality." *Easley*, 192 Ill. 2d at 322. Taking as true the allegations that the defendant suffered from mental illness, we nevertheless rejected his claim that his mental illness raised a *bona fide* doubt as to his ability to understand the proceedings against him and cooperate with counsel in his defense. *Easley*, 192 Ill. 2d at 322-23.

In the present case, petitioner has presented evidence obtained subsequent to his conviction that was cumulative to the various psychiatric diagnoses made before he pleaded guilty. The new evidence, however, when consid-

ered along with the record of his conduct before the trial court, does not raise a *bona fide* doubt of his fitness in 1990. As we noted in *Easley*, "a defendant may be fit for trial although his or her mind may be otherwise unsound." *Easley*, 192 Ill. 2d at 322. See also *People v. Sanchez*, 169 Ill. 2d 472, 483-84 (1996) (a history of attempted suicide does not demonstrate that the defendant's ability to understand the proceedings or assist in his own defense was diminished).

We conclude that no *bona fide* doubt as to petitioner's fitness would have existed at the time he pleaded guilty, even if the trial court had been aware of the facts now available, including the testimony at his sentencing hearing, the deposition of defense counsel, and the Ramsden and Gelbort reports. We note that both Grigsby and Ramsden testified at the hearing on petitioner's motion to withdraw his guilty plea. At the conclusion of that hearing, the trial court commented that, "having had the opportunity to observe the defendant over a number of months in the courtroom setting," petitioner "well understood what these proceedings were about." Petitioner "clearly and unequivocally" instructed counsel to take certain positions, and to withdraw certain motions; counsel advised against these actions, but carried out petitioner's instructions. The court concluded that petitioner "made those instructions knowingly and intelligently, and he made his plea knowingly and intelligently." Based on the entire record, we hold that the circuit court did not err when it denied petitioner's claim that his new evidence creates a *bona fide* doubt of his fitness at the time he pleaded guilty.

Petitioner briefly raises a separate but related claim that, even if he was minimally competent to stand trial, he was not competent to enter a knowing and voluntary guilty plea. He asserts that the level of competence required to enter a guilty plea is higher than that

required to stand trial and that both trial and appellate counsel were ineffective for failing to raise this issue. This argument was not contained in his amended post-conviction petition and, thus, the claim is waived.

## II. Ineffective Assistance of Trial Counsel

Petitioner's claim of ineffective assistance of trial counsel contains two separate assertions of ineffectiveness. First, petitioner points to the fact that he was represented before the trial court by only one attorney. Second, petitioner claims that there is a reasonable probability he would not have received the death sentence if counsel had obtained and presented a report by a mitigation specialist. The circuit court rejected both claims, stating that it was familiar with defense counsel's work and that he was an experienced public defender, with felony experience including at least one prior death penalty case.

These claims were not raised on direct appeal. Instead, petitioner argued on direct appeal that trial counsel was ineffective because he introduced the reports of Drs. Hamilton and Bornstein at the mitigation stage and these reports, in addition to documenting the facts that counsel was offering in mitigation, contained some information that might have been seen as damaging. *Johnson*, 154 Ill. 2d at 368-69. We rejected that argument, finding that counsel's decision to offer the reports was reasonable. *Johnson*, 154 Ill. 2d at 369-70.

Thus, petitioner's new claims regarding the effectiveness of trial counsel are waived for failure to raise them on direct appeal. *Towns*, 182 Ill. 2d at 502-03. He has not argued that appellate counsel was ineffective for failing to raise them. Nevertheless, the State has not asserted waiver and we choose to address these claims on their merits under the familiar *Strickland* standard of deficient representation plus prejudice. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

Petitioner has provided photocopies of the "American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases" (no date given) and the National Legal Aid and Defender Association's "Standards for the Appointment and Performance of Counsel in Death Penalty Cases" (dated November 18, 1988). Because these standards recommend that a capital defendant be represented by more than one attorney, he claims to have been denied the effective assistance of counsel.

Petitioner has cited no authority from any jurisdiction in which a court has held that representation of a capital defendant by a single attorney is *per se* ineffective assistance of counsel. In the absence of such authority, this claim can succeed only if both prongs of the *Strickland* test are met. The fact that a single attorney might represent a capital defendant is not objectively unreasonable under prevailing professional norms. In addition, petitioner has not described what an additional attorney might have done on his behalf that his own attorney did not do. In short, he has not even attempted to argue prejudice. Therefore, because the claim fails both prongs of *Strickland*, the circuit court did not err in denying it.

Petitioner next argues that trial counsel was ineffective for failing to arrange for a mitigation specialist from the Capital Resource Center to evaluate him and prepare a mitigation report. To prevail on a claim of ineffective assistance of counsel at the sentencing stage, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that, absent counsel's errors, there is a reasonable probability that the trier of fact would have concluded that the balance of aggravating and mitigating factors weighed against imposing the death penalty. *Mitchell*, 189 Ill. 2d at 347. Counsel has a duty to make a reasonable investigation of potential sources of mitigating evidence and to present

such evidence at the capital sentencing hearing. *Towns*, 182 Ill. 2d at 510. Strategic choices made by counsel after having made a thorough investigation are virtually unchallengeable. *Towns*, 182 Ill. 2d at 514; see also *Strickland*, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066. Strategic decisions made after a less than complete investigation, however, will survive challenge only if the limited investigation was the result of reasonable professional judgment. *Strickland*, 466 U.S. at 691, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066.

At the mitigation stage of this case, counsel offered the reports of the two psychiatrists who assessed petitioner's fitness for trial, the testimony of petitioner's mother, and that of Robert Samuelson, a rehabilitation counselor at the Chicago Lighthouse for the Blind, who evaluated and counseled petitioner in the early 1970s. The trial court found no factors in mitigation. *Johnson*, 154 Ill. 2d at 361. Petitioner states that the trial court remarked that the only fact in mitigation is that he is "a human being." Reviewing the transcript, we find that, in fact, after commenting that the parents of the murdered child had "stretched out the hand of friendship" to petitioner and had entrusted him with the care of their children, the trial court commented that "there is nothing more than the very fact of your humanity to commend you for this Court's mercy. And the mere fact of your humanity is not sufficient unto itself."

Petitioner now seeks consideration of additional evidence that he contends trial counsel should have obtained and offered in mitigation.

The record before the circuit court as it considered this post-conviction petition included the report of Jeffrey Eno, a licensed clinical social worker and mitigation specialist for the Capital Resource Center, who conducted his mitigation assessment in 1995. Eno documented petitioner's disadvantaged childhood, includ-

ing his diagnosis at the age of four with congenital cataracts, which rendered him legally blind. He was bullied by children at school and in the neighborhood. At the age of 14, he was hospitalized at Cook County Hospital because of depression and suicidal ideation. (The page of Eno's report that immediately follows this statement is missing, so only the bare fact of the hospitalization is documented.) Petitioner suffered several traumatic losses, including the death by drug overdose of one sister to whom he was very close and the murder of another sister. He has a history of drug and alcohol abuse beginning at the age of 12, which may have caused organic brain damage. He also suffered multiple head traumas that may have caused neurological damage.

Eno's report is thorough and well organized. However, the information itself is quite similar to that contained in the reports of Hamilton and Bornstein, which were available to the trial court when it imposed sentence. Thus, petitioner was not prejudiced by the absence of a report by a mitigation specialist, and counsel was not ineffective for failing to obtain such a report. No manifest error occurred.

### III. Conflict of Interest of Court-Appointed Defense Counsel

Petitioner asserts that a public defender who is appointed by the vote of a majority of circuit judges operates under an inherent conflict of interest. Specifically, petitioner asserts that counsel's "decisions not to request a jury trial or jury sentencing, not to seek assistance of second counsel and not to seek the assistance of a social worker for sentencing could all [have been] motivated by an interest to save the County money and thus not invoke the 'displeasure' of the circuit judges." He did not raise this issue on direct appeal, and now claims that appellate counsel was ineffective for failing to do so.

Like claims alleging ineffective assistance of trial

counsel, claims of ineffective assistance of appellate counsel are evaluated under the two-part test set forth in *Strickland*, which requires a showing that counsel's performance was objectively unreasonable and that it prejudiced the defendant. *Easley*, 192 Ill. 2d at 328-29. "Appellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong." *Easley*, 192 Ill. 2d at 329. Accordingly, unless there is merit to petitioner's underlying claim, he can have suffered no prejudice from counsel's failure to raise it on direct appeal.

Petitioner has not cited a single case from Illinois or elsewhere in which a public defender or other court-appointed attorney was deemed to be operating under an inherent conflict of interest merely because his paycheck comes from county coffers. He has attempted to fault counsel's decisionmaking, but fails to acknowledge that the decisions to plead guilty and to waive a jury for sentencing were his own. We have already determined that he was not prejudiced by the lack of a mitigation specialist's report.

In the end, petitioner's conflict of interest claim is totally lacking in merit. Appellate counsel was not ineffective for choosing not to make a meritless argument. The circuit court properly dismissed this claim.

IV. Sentencing of Similarly Situated Defendants

Petitioner asserts that both trial and appellate counsel were ineffective for failing to argue that his death sentence cannot stand when similarly situated defendants have not received the same sentence. Petitioner would define "similarly situated" as having been convicted of a crime that is factually similar to his own. This claim was properly dismissed by the circuit court because it fails as a matter of law.

Our constitutional duty is to determine whether the death penalty has been imposed arbitrarily or capriciously, or is unduly severe, considering the circumstances of the offense and the character and rehabilitative potential of the individual defendant. *People v. Williams*, 192 Ill. 2d 548, 576 (2000). Comparative proportionality review in capital cases is not required by either the United States Constitution or the Illinois death penalty statute. Thus, we do not compare the sentence received by one individual to sentences received by other individuals convicted of similar crimes. Only when one defendant is sentenced to death while his codefendant or accomplice, convicted of the same crime, receives a lesser sentence will we engage in a comparative review of disparate sentences. See, *e.g.*, *People v. Towns*, 174 Ill. 2d 453, 479 (1996). Petitioner acted alone and, thus, proportionality review is neither required nor appropriate. We, therefore, affirm the circuit court's dismissal of this claim.

V. Constitutionality of the Death Penalty Statute

Petitioner's final argument is that the death penalty statute is unconstitutional because once a defendant has been found eligible for the death penalty based on the presence of one or more aggravating factors, the statute, in effect, places upon the defendant the burden of persuading the jury that the mitigating factors outweigh aggravating factors.

This argument was made by petitioner and rejected by this court on direct appeal and is, therefore, *res judicata*. See *Johnson*, 154 Ill. 2d at 373. The circuit court properly dismissed this claim.

## CONCLUSION

We affirm the judgment of the circuit court and direct the clerk of this court to enter an order setting Thursday, March 13, 2003, as the date on which the sentence of

death entered by the circuit court of Montgomery County shall be carried out. Petitioner shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 2000). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Tamms Correctional Center, and to the warden of the institution where petitioner is now confined.

*Affirmed.*

JUSTICE RARICK took no part in the consideration or decision of this case.

JUSTICE KILBRIDE, dissenting:

For the reasons set forth in my dissents in *People v. Hickey*, 204 Ill. 2d 585, 636-40 (2001) (Kilbride, J., dissenting), and *People v. Simpson*, 204 Ill. 2d 536, 581-85 (2001) (Kilbride, J., dissenting), I believe that defendant's convictions and sentence should be set aside because the trial proceedings were not conducted in accordance with the new supreme court rules governing capital cases. As I stated in my dissents, the procedures in capital cases prior to this court's adoption of the new rules were inherently unreliable and did not sufficiently protect a defendant's constitutional rights. For this reason, the new rules should be applied retroactively. See *People v. Caballero*, 179 Ill. 2d 205, 220-21 (1997). Therefore, I respectfully dissent.