2021 IL App (1st) 181261-U

FIRST DISTRICT,
FIRST DIVISION
June 21, 2021

No. 1-18-1261

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| v. | ) | No. 10 CR 164 |
| | ) | |
| SHERMAN ALEXANDER, | ) | Honorable |
| | ) | Charles P. Burns, |
| Petitioner-Appellant. | ) | Judge Presiding. |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Justices Hyman and Pierce concurred in the judgment.

**ORDER**

¶ 1     *Held*:   Following his conviction for aggravated arson and residential arson, defendant filed a postconviction petition alleging ineffective assistance of appellate counsel for failing to challenge the trial court's denial of his motion to suppress evidence. We affirm the second-stage dismissal of his petition, finding his underlying claim lacks merit.

¶ 2     Defendant Sherman Alexander was convicted of aggravated arson and residential arson

in connection with a fire at his former girlfriend's home. After his conviction was affirmed on

direct appeal, he filed a postconviction petition arguing that his appellate counsel was ineffective

for failing to challenge the trial court's denial of his motion to suppress evidence where there were no exigent circumstances for police to enter his home and make a warrantless arrest. The circuit court dismissed his petition at the second stage of postconviction proceedings. For the reasons that follow, we affirm.

¶ 3                                    BACKGROUND

¶ 4        At trial, Carolyn Walls testified that on December 7, 2009, between 3 and 4 p.m., she was at her father's house, which is across the street from a two-flat apartment building located at 5215 West Van Buren Street (the Van Buren building). She saw a man, whom she identified in court as Alexander, walk up the stairs of the building and pour liquid from "a small red gas can" onto the stairwell, the doors, and the side of the building. Upon seeing this, Walls immediately called 911.

¶ 5        Walls continued to watch as Alexander walked down the stairs and away from the building. He was stumbling and appeared to be intoxicated. Walls followed him on foot for approximately a block, then called out, "Hey!" When he turned to face her, she took a picture of him with her cell phone, then left the scene and returned to her own home.

¶ 6        About 15 minutes later, she received a phone call from her father's neighbor and returned to the Van Buren building. The fire had been extinguished, and she could see fire damage to the building's exterior. She told officers at the scene what she had observed, gave them a description of the offender, and showed them the picture she had taken with her cell phone.

¶ 7        Sharon Dean testified that Alexander was her former boyfriend, but she had broken up with him a few months earlier and moved into the basement apartment of the Van Buren building with her new boyfriend. On the afternoon of the fire, she was at home alone taking a nap, when

she was awoken by water falling from the ceiling into her apartment. She ran outside, saw a fire truck, and spoke to police officers.

¶ 8    Detective Michael Vogenthaler, an expert in the field of fire investigation, testified that he was assigned to investigate the fire at around 4 p.m. that day. By the time he arrived at the building, the flames had been extinguished, but he observed heavy fire damage and a strong odor of gasoline in the vestibule. In his opinion, the fire was started by open flame being applied to the floor of the vestibule, and gasoline was used to ignite the fire.

¶ 9    Immediately after Walls identified Alexander as the "man with a gas can drenching gasoline on the stairwell, on the front doors" in a photo array, Vogenthaler and two other officers (Officer Soto and Officer Hardik Suthar) went to Alexander's home, a two-flat apartment building, arriving at 6:19 p.m. Vogenthaler and Soto went to the front of the building, while Suthar guarded the back door. Vogenthaler knocked on the first-floor window, announced his office and displayed his badge. The blinds parted, and Vogenthaler saw Alexander standing on the other side of the window. Alexander closed the blinds and "retreated back into the apartment." Moments later, Vogenthaler heard Suthar yelling from the rear of the building.

¶ 10    Suthar testified that Alexander emerged from the back door looking like he was in a hurry. When Suthar announced his office, Alexander went back into the building and slammed the door shut.

¶ 11    Vogenthaler entered the building and chased Alexander up the stairs. The door to the second-floor apartment was closed, but Alexander "just forced it open and continued on." Vogenthaler followed Alexander into the apartment and arrested him. Vogenthaler and Suthar both smelled strong odors of gasoline and alcohol on Alexander. Vogenthaler noticed that Alexander's walking was "very unsteady," and he appeared to be intoxicated.

¶ 12       The day after Alexander's arrest, Walls identified him in a lineup. Chemical analysis of Alexander's clothes and shoes revealed the presence of gasoline.

¶ 13       Alexander testified in his own defense that on the afternoon of the fire, he was visiting his nephew, who lived four houses away from the Van Buren house. Alexander drank a "couple six packs" of beer but was "[n]ot really" drunk and left to purchase more beer. Walking back from the liquor store, he saw a stranger in the alley next to the Van Buren house sprinkling something on the building from a can in his hand. The stranger said he was going to "burn his baby down" [*sic*]. Alexander "grabbed the can" to "[t]ry to take it from him," but the stranger "snatched it back." Alexander did not recall any liquid from the can spilling on his clothes, but he "guess[ed]" that it did.

¶ 14       After a 30-second struggle over the can, Alexander left the scene, returned to his nephew's house, and continued drinking beer. He did not tackle or punch the stranger, nor did he attempt to warn the building's tenants or call the police. An hour later, Alexander went back to his own apartment and fell asleep.

¶ 15       Later that afternoon, his sister Tracy called and "relay[ed] to [him] a conversation she had with Sharon Dean." When a detective subsequently knocked on Alexander's window, he "was scared" because of the earlier phone call. He attempted to exit the building via the back door, but there was an officer there, so he closed the door and went upstairs to the second-floor apartment. The police kicked in the door of the building and followed him upstairs, where he was arrested. Alexander explained that a tenant resided in the second-floor apartment, but he owned the building.

¶ 16       In rebuttal, Vogenthaler testified that when he first interviewed Alexander the day after the fire, he denied knowing anyone who lived at the Van Buren building or walking past the

building that day. After being confronted with the fact that a witness had seen him pouring gasoline at the building and had taken a picture of him, he initially said the witness was lying and "the picture was a fake," then changed his story, stating that he had walked by and seen a black male carrying a gas can who "motioned to the building and said something to the effect that I'm going to burn this place down." Alexander unsuccessfully attempted to grab the gas can, then "continued on his way" while the man walked up the stairs to the building.

¶ 17    Prior to trial, Alexander filed a motion to suppress evidence, arguing that the police had entered his home without a warrant and without consent. Following a hearing at which Vogenthaler, Suthar, and Alexander testified, the motion was denied.

¶ 18    A jury found Alexander guilty of aggravated arson and residential arson, and he was sentenced to eight years' imprisonment. On direct appeal, appellate counsel argued that the sentence was excessive and also challenged the court's imposition of a DNA analysis fee. On November 13, 2013, we vacated the DNA analysis fee but otherwise affirmed his conviction and sentence. *People v. Alexander*, 2013 IL App (1st) 120506-U.

¶ 19    On January 30, 2014, Alexander filed a *pro se* postconviction petition, arguing, in relevant part, that appellate counsel was ineffective for failing to challenge the denial of his pretrial motion to quash arrest and suppress evidence. The circuit court allowed Alexander's petition to proceed to the second stage, whereupon the State moved to dismiss, arguing that appellate counsel was not ineffective because Alexander's motion was "meritless." On May 1, 2018, the circuit court dismissed Alexander's petition.

¶ 20                                    ANALYSIS

¶ 21    The Post-Conviction Hearing Act allows a convicted defendant to challenge his conviction as a substantial denial of his rights under either the United States or Illinois

Constitutions. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). At the second stage of postconviction proceedings, the circuit court appoints counsel to represent the defendant, and the State may file a responsive pleading. *People v. Edwards*, 197 Ill. 2d 239, 245-46 (2001). To avoid dismissal, defendant's petition must make a "substantial showing" of a constitutional violation. *Id.* at 246. We review the second-stage dismissal of a postconviction petition *de novo*. *People v. Sanders*, 2016 IL 118123, ¶ 31.

¶ 22 Alexander argues that the trial court erred in denying his motion to suppress evidence (namely, the clothes he was wearing which tested positive for the presence of gasoline). He further argues that if appellate counsel had raised this claim, there is a reasonable probability that we would have reversed his conviction and granted him a new trial. The State responds that the motion was properly denied because exigent circumstances justified the warrantless search and seizure.

¶ 23 Although claims that could have been raised on direct appeal are generally barred in postconviction actions due to *res judicata* and waiver, these doctrines are relaxed where the alleged waiver stems from a claim of ineffective assistance of appellate counsel. *People v. Davis*, 377 Ill. App. 3d 735, 745 (2007). To prove ineffective assistance, a defendant must show that (1) counsel's performance was objectively unreasonable and (2) defendant was thereby prejudiced. *People v. Patterson*, 2014 IL 115102, ¶ 81 (citing *Strickland v. Washington*, 466 U.S. 668, 692 (1984)); see *People v. Johnson*, 206 Ill. 2d 348, 378 (2002) (applying *Strickland* to claim of ineffective assistance of appellate counsel). "[U]nless there is merit to petitioner's underlying claim, he can have suffered no prejudice from counsel's failure to raise it on direct appeal." *Johnson*, 206 Ill. 2d at 378 (appellate counsel was not ineffective for failing to raise meritless argument).

¶ 24      Warrantless searches and seizures within the home are presumptively unreasonable, since "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." (Internal quotation marks omitted.) *Payton v. New York*, 445 U.S. 573, 586 (1980). However, exigent circumstances can "make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." (Internal quotation marks omitted.) *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). In determining whether exigent circumstances existed, relevant factors to consider include whether:

> "(1) the crime under investigation was recently committed; (2) there was any deliberate or unjustified delay by the police during which time a warrant could have been obtained; (3) a grave offense was involved, particularly a crime of violence; (4) there was reasonable belief that the suspect was armed; (5) the police officers were acting on a clear showing of probable cause; (6) there was a likelihood that the suspect would escape if he was not swiftly apprehended; (7) there was strong reason to believe the suspect was in the premises; and (8) the police entry was made peaceably, albeit nonconsensually." *People v. McNeal*, 175 Ill. 2d 335, 345 (1997).

No single factor is dispositive; rather, we consider whether the totality of the circumstances militated against delay and justified the decision not to obtain a warrant. *Id.*; *People v. Foskey*, 136 Ill. 2d 66, 75 (1990).

¶ 25      Here, any error in denying Alexander's motion to suppress is subject to the harmless error rule. *People v. Hobson*, 169 Ill. App. 3d 485, 493 (1988) (admission of evidence following erroneous denial of motion to suppress is subject to harmless-error analysis). Even assuming *arguendo* that warrantless entry into Alexander's home was not justified by the exigency of the circumstances, the admission of evidence that his recovered clothing tested positive for gasoline

was harmless beyond a reasonable doubt. *Id.*; see also *People v. McCann*, 348 Ill. App. 3d 328, 338 (2004) (any error in admission of evidence was harmless where the evidence of defendant's guilt was overwhelming). Walls, the prosecution's chief witness, identified Alexander in a photo lineup, a physical lineup, and at trial. Her unimpeached testimony established that she observed him committing arson in the middle of the afternoon, watching from across the street as he walked up the stairs, poured gasoline around the vestibule and the side of the building, and walked back down the stairs. After calling 911, she followed him for half a block before calling out to get his attention and taking a picture of him with her cell phone.

¶ 26        In addition to taking his picture, she gave a detailed description of the offender to police on the scene (a black man 6'2" or 6'3" tall, weighing around 230 pounds and wearing a black jacket and black jeans) that closely matched Alexander's physical description (black, 6'3", 202 pounds, and wearing a black jacket, black shirt, and black jeans at the time of his arrest). Moreover, her testimony that the arsonist was heavily intoxicated was consistent with Vogenthaler and Suthar's testimony that Alexander smelled strongly of alcohol.

¶ 27        In contrast, Alexander's implausible version of events was uncorroborated and impeached at trial. For example, Alexander originally claimed he never walked by the Van Buren building on the day of the fire, only to change his story upon learning that he had been identified at the scene. With respect to the gasoline on Alexander's clothes, Alexander admitted that gasoline could have spilled on his clothes during his struggle with the unknown arsonist. Moreover, chemical analysis of Alexander's clothes was cumulative of the testimony of arresting officers Vogenthaler and Suthar, who stated that Alexander smelled strongly of gasoline. See *People v. Mueller*, 2021 IL App (2d) 190868, ¶¶ 56-57 (even assuming *arguendo* that evidence

was improperly admitted, its admission was harmless since it was cumulative of properly introduced evidence).

¶ 28 We find that Alexander has failed to show a reasonable probability that his conviction would have been reversed on direct appeal absent appellate counsel's alleged error. *People v. Titone*, 151 Ill. 2d 19, 36 (1992) (to demonstrate prejudice, petitioner must show a reasonable probability that absent appellate counsel's error, his conviction or sentence would have been reversed on direct appeal). Based on Alexander's failure to make a "substantial showing" of a constitutional violation, his postconviction petition was properly dismissed. See *Johnson*, 206 Ill. 2d at 378.

¶ 29 CONCLUSION

¶ 30 For the foregoing reasons, we affirm the judgment of the circuit court dismissing Alexander's postconviction petition at the second stage.

¶ 31 Affirmed.