2020 IL App (1st) 170028
No. 1-17-0028

SIXTH DIVISION
January 24, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| | ) | Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | 87 CR 8638 |
| | ) | |
| ARTHUR ALMENDAREZ, | ) | |
| | ) | Honorable Timothy Joyce, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE CONNORS delivered the judgment of the court.
Presiding Justice Mikva and Justice Harris concurred in the judgment.

**ORDER**

¶ 1    *Held:* New evidence presented at the third-stage postconviction hearing, when weighed against the State's original evidence, was conclusive enough that the outcome of the suppression hearing likely would have been different if detective had been subject to impeachment based on evidence of abusive tactics he employed in the interrogation of others; reversed and remanded for new suppression hearing.

¶ 2    Defendant-petitioner, Arthur Almendarez, appeals from the dismissal of his third-stage successive postconviction petition. On appeal, petitioner contends in part that the trial court's dismissal of his third-stage postconviction petition was manifestly erroneous where the trial court disregarded the evidence establishing that detectives were engaged in a pattern of abuse to coerce

confessions. For the following reasons, we reverse the judgment of the trial court, remand for a new suppression hearing, and if necessary, a new trial.

¶ 3                                    BACKGROUND

¶ 4      For purposes of this appeal, we will include only a brief summary of the facts related to the crime and subsequent trial because those facts are described in detail in the direct appeal of petitioner's codefendant John Galvan (*People v. Galvan*, 244 Ill. App. 3d 298 (1993)), in this court's order remanding petitioner's postconviction petition for an evidentiary hearing (*People v. Almendarez*, 2013 IL App (1st) 100306-U), and in our recent opinion in codefendant Galvan's case (*People v. Galvan*, 2019 IL App (1st) 170150).

¶ 5      On September 21, 1986, at approximately 4 a.m., there was a fire at 2603 West 24th Place in Chicago that killed two young men, Guadalupe Martinez and Julio Martinez, who resided with their family in the upstairs apartment of the building. Their siblings, Blanca Martinez (Blanca) and Jorge Martinez (Jorge), escaped. Investigators suspected arson. Petitioner and two other men, John Galvan and Francisco Nanez, were arrested nine months after the fire and charged with aggravated arson and first-degree murder. Following a jury trial, petitioner was convicted of aggravated arson and the murders of the two people who died in the fire. He was sentenced to natural life in prison without parole.

¶ 6      Prior to trial, defense counsel filed a motion to quash petitioner's arrest and suppress his confession. Petitioner stated in the motion that he was "kicked in the groin area and repeatedly struck in the back of the head" by two Area 4 detectives, Victor Switski and James Hanrahan. Petitioner argued that he did not receive *Miranda* warnings and was denied the opportunity to consult his family members or an attorney. Petitioner stated that he was repeatedly told that he was at the scene of the crime, and that he was lying when he denied it. Petitioner stated that the

2

detectives told petitioner that two other people had made statements that did not incriminate him, and that if he signed a statement, he would be allowed to go home.

¶ 7    At the hearing on the motion, Detective Switski and Detective Hanrahan denied that any physical abuse occurred. They claimed that petitioner received *Miranda* warnings before being questioned, and that no one told him he could go home if he signed a statement. Petitioner's motion to suppress was denied.

¶ 8    Petitioner and Nanez were tried jointly by separate juries. Galvan's trial was severed. The testimony presented was substantially the same as that presented in Galvan's trial. See *People v. Galvan*, 2019 IL App (1st) 170150, ¶¶ 7-13. The only evidence linking petitioner to the crime was his confession.

¶ 9    In March 2001, petitioner filed a *pro se* postconviction petition arguing that his natural life sentences were unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and therefore void. Galvan filed a similar petition, and throughout the postconviction proceedings, the two cases were considered simultaneously. Petitioner filed three supplemental postconviction petitions: the first in March 2003, the second in February 2004, and the third in October 2004. In the second supplemental postconviction petition, petitioner argued that his statement was involuntary and the product of police abuse.

¶ 10    The trial court granted the State's motion to dismiss petitioner's postconviction petition in 2009. Petitioner appealed, arguing that this court should reverse because he sufficiently alleged a claim of actual innocence and that newly discovered evidence of police coercion at Area 4 supported his claim. *People v. Almanderez*, 2013 IL App (1st) 100306-U, ¶ 23. We reversed, concluding that the original denial of the State's motion to dismiss was not clearly erroneous and should not have been reevaluated by a successor judge. *Id*. ¶ 32. We found that

petitioner presented "an even stronger case than Galvan" because "there were no eyewitnesses who placed [petitioner] at the scene, *** no physical evidence connecting [petitioner] to the crime and he was convicted solely upon his handwritten confession." *Id.* ¶ 33. We remanded for a third-stage evidentiary hearing, noting that only at an evidentiary hearing could factual disputes be resolved and the credibility of witnesses be determined. *Id.*

¶ 11    A joint evidentiary hearing for petitioner and Galvan was conducted over the course of 14 days. We will discuss the evidence that was presented at this hearing even though they are discussed in detail in *People v. Galvan*, 2019 IL App (1st) 170150, ¶¶ 7-13.

¶ 12    Partida testified that in the early morning hours of September 21, 1986, he was working at a bar called Chunkys. He finished working at 3:30 a.m. and was walking home when he ran into two young men, Ramirez and Rodriguez. Partida testified that Ramirez was helping Rodriguez walk and that it looked like they were intoxicated. Ramirez told Partida that they had been ingesting "wicky sticks," which Partida believed to be marijuana sticks dipped in phencyclidine (PCP). Partida and Ramirez helped Rodriguez walk to a nearby fire hydrant for a drink of water. When they got there, Partida noticed three "young kids" walking toward them. He did not recognize them, and he asked Ramirez if he recognized them. Ramirez told Partida he did not.

¶ 13    Partida testified that shortly thereafter, he heard a woman yelling "fire" in Spanish. Partida stated that the woman was Socorro Flores, and that she came running out of her house telling Partida that "they threw the thing in the window" and that "it's burning." Partida saw the three boys running west down the alley at that time, but he was focused on helping Flores. Partida testified that he was the first one at the scene of the fire and that he helped a woman

escape from the second-floor window. Partida stayed at the scene until the two decedents were brought out of the house.

¶ 14     Partida testified that about six to seven months after the fire, two detectives met with Partida at his house. One of the detectives showed Partida pictures of three men and indicated that they were the men who started the fire. Partida recognized two of the men as petitioner and codefendant Galvan. Partida told the detectives that he knew those two young men from the neighborhood but had not seen them on the night of the fire. Partida testified that his brother, who was a Chicago police officer, talked to Partida after the detectives left and said they had talked to him and "they want me to talk to you about giving up some names or something." Partida agreed to talk to detectives again, on the condition that they were different detectives.

¶ 15     Partida testified that he again spoke to detectives and that he identified petitioner and Galvan in the pictures as young men he knew. Partida also told the detectives that he was with Ramirez and Rodriguez on the night of the fire and that they were intoxicated. Partida stated that he had seen the police reports that were generated as a result of the two interviews he gave and there were things missing—namely, that the young men were intoxicated and high. Partida testified that while the police report stated that he did not get a good look at the three men in the alley, he actually did get a good look but did not recognize them.

¶ 16     Partida testified that he was never asked to testify at trial. He signed three affidavits over the years stating that he did not recognize the three young men he had seen walking in the alley on the night in question. Partida testified on cross-examination that the first affidavit, dated February 28, 1995, had some information missing but he signed it anyway because he believed it could be changed later. Paragraph nine stated, "I looked down the alley and approximately 100 feet north of where we were standing I saw three figures. Because of the distance and the

darkness, I could not tell who these individuals were." Partida also stated in that affidavit that he was positive that neither Rodriguez nor Ramirez "could possibly have identified these individuals." Partida testified that the statement was what he signed but that it was not what he had told investigators. Partida confirmed that his affidavit stated that he had been recently informed that Ramirez testified at trial that he could identify Galvan as one of the three individuals he saw in the alley but that Partida "was positive that this was not possible because of the distance and the darkness."

¶ 17    Partida was then presented with a letter that he had signed, dated July 15, 2002, to which Partida attached an affidavit that had been executed in April 2001. The letter was addressed to the public defender's office, stating that Partida gave permission for the office to use his affidavit. In that affidavit, Partida stated that when he reached the alley on the night in question, he looked down the alley and approximately 100 feet north of where they were standing, he saw three figures. He stated that because of the distance and the darkness, he could not identify the individuals, and he was positive that neither Rodriguez nor Ramirez could have identified any of the three individuals.

¶ 18    Mary Jane Borys testified at the evidentiary hearing that she was living in the same apartment building as the Martinez family up until the month before the fire and that Blanca was her landlady. She lived with Jose Santos at the time, who was her common law husband. Borys testified that she knew Jorge as Blanca's brother and that she believed he was in the Latin Kings gang. Borys testified that she knew Lisa Velez fairly well through her common law husband and Velez was affiliated with a gang. She stated that she moved out of the apartment building in August 1986, right before she gave birth to her daughter. Borys testified that when she saw news of the fire on television, she thought to herself that Velez had meant what she said when she said

she wanted to burn down Blanca's house. Borys testified that this conversation took place about a week before the fire. She stated that Velez mentioned burning the place down on a weekend so that Blanca and Jorge would be there. Borys testified that Velez told her that she would wait until Borys moved out to do anything. Borys testified that Velez stated that she wanted to get even with Blanca. Borys stated that Velez mentioned burning down the building in question in front of Santos and Leticia Figueroa.

¶ 19    Borys further testified that she talked to police on two occasions after the fire. The first time was the evening after the fire, when the police came to talk to Santos. They took Santos to the station for questioning, and several hours later Borys went to the police station. She testified that she screamed at the police that Santos had nothing to do with the fire and that it was Velez who started it.

¶ 20    Borys testified that sometime within the next seven months, the police asked her to come into the police station for an interview. Borys testified that she gave them a statement and told them that she had been involved in a conversation in which Velez had made threats about burning Blanca's place down. Borys stated that she told police Velez was going to wait until Borys moved out because Borys was pregnant. Borys testified that the police officers took notes, but she never heard from them again and had no idea if anyone was convicted of the crime.

¶ 21    Borys further testified that many years later, she was contacted by the mother of one of the men who was convicted of the crime, and she signed an affidavit that comported with her testimony. On cross-examination, Borys confirmed that she signed her affidavit on November 23, 1996. When asked if she had any concerns about testifying, Borys started to cry and said she was afraid to come to court because she was afraid of what "she" might do if she found out that Borys testified.

¶ 22    Detective Thomas Jones testified that there were multiple witnesses who told him that Velez had made threats to burn down the building in question. This evidence was reflected in police reports wherein Borys, Santos, Figueroa, and Blanca all told police of Velez's threats.

¶ 23    The parties stipulated that Mario Velez, Velez's brother, lived at 2615 West 23rd Place in Chicago in June 1985, and was killed on the sidewalk next door on June 16, 1985.

¶ 24    Galvan testified at the evidentiary hearing that he was 46 years old but that he had turned 18 just a few days before the fire. Galvan stated that on the night in question, his girlfriend, Maria Gallegos (Maria), picked him up at this grandmother's house at 2617 West 24th Street. Maria was with her sister, Monica Gallegos (Monica), and they eventually picked up his brother, Isaac Galvan (Isaac). Galvan testified that at 3 a.m., an unmarked police car pulled them over on 25th Street. Galvan testified that the police officers asked how old Monica was, issued a curfew slip, and then followed them to petitioner's grandmother's house. Galvan testified that he then went inside, and his brother got into his car and went home. Galvan stated that he did not have a key, so his grandmother had to let him in. He took off his shoes and went right to bed. Galvan testified that he learned of the fire a day or two later.

¶ 25    Galvan further testified that on June 8, 1987, Detective Switski and Detective Hanrahan came to his house and arrested him. They put handcuffs on him and did not tell him why he was under arrest. His brother was also placed under arrest. Galvan testified that when they got to Area Four police headquarters, he was handcuffed to a wall. Detective Switski then walked out without saying anything to Galvan. Galvan stated that about half an hour later, Detective Odaya came in and asked if he knew why he was there. When Galvan stated that he did not, Detective Odaya told him that two people had died in a fire in September 1986 and Galvan was responsible for it. Detective Odaya called Galvan a murderer and told him things would get "a lot easier" if

he admitted to it. Galvan denied any involvement. Galvan testified that Detective Odaya told him he was a liar and that he was going "hang" for this, so Galvan stopped talking to her.

¶ 26    Galvan testified that Detective Switski came in the room next, about 20 minutes later. Detective Switski asked if Galvan had any gang problems in the neighborhood where he grew up, and Galvan told him about a time in winter 1986 when he had been hit with a baseball bat and robbed. Galvan also told him that he was driving by the corner of 18th Street and Throop Street and thought he had been shot at by Villa Lobos gang members.

¶ 27    Galvan testified that Detective Switski then left for an hour or two, and when he came back in the room, he sat down and began writing on a pad of paper. When he was done writing, he showed it to Galvan. He told Galvan it was his voluntary confession. Galvan testified that he argued with Detective Switski and told him that the information on the pad of paper was not true. Galvan testified that Detective Switski then grabbed the back of his hair and forced him to look up at him. He began yelling and told petitioner he was going to agree. He then pushed Galvan's head against the wall. Galvan testified that he was yelling that Detective Switski was hurting him and eventually the detective let Galvan go and said he was going to leave and let Galvan think about it.

¶ 28    Galvan testified that Detective Switski returned in about a half hour later and his tone of voice had changed. He told Galvan he wanted to help him, and that in order to help him, Galvan had to agree to what Detective Switski had written down. He told Galvan it was the only way he would be able to go home. Galvan told Detective Switski that he did not commit the crime, whereupon Detective Switski pushed his head down and began punching Galvan in the back of the head. Galvan testified that he was yelling and crying and that Detective Switski just punched him harder. When he stopped, he kicked Galvan in the leg and said he did not care if the

9

statement was true or not. He told Galvan that he would be lying in a grave next to Galvan's father and that he would shoot Galvan himself if he had to. He then left again, this time leaving the pad of paper with Galvan for him to study until he came back.

¶ 29    Galvan testified that he was scared at this point. The room was freezing, he was tired and hungry, his back and arms hurt, and he wanted to go home. Galvan stated that Detective Switski returned about a half hour later. He grabbed Galvan's hair and told him to "tell him." Galvan said he would not and Detective Switski began punching him again in the back of the head. Galvan testified that he then yelled out "okay," and Detective Switski stopped punching him. Detective Switski then held the pad of paper up for Galvan to read and told him to learn it. He left the pad of paper there again and walked out.

¶ 30    Galvan testified that about a half hour later, Detective Switski came back in and asked Galvan to recite the statement from memory. When Galvan could not do it, Detective Switski punched him in the forehead. Detective Switski hit Galvan about four or five times until he got the story right. Galvan testified that when he got the story right, Detective Switski told him he was proud, and that Galvan was going home. Detective Switski took Galvan out of the handcuffs and said he needed to speak to one other person before Galvan could go home. Detective Switski left again for about an hour.

¶ 31    Galvan testified that Detective Switski then came back in and escorted him into a different room. There was a man in that room, Assistant State's Attorney (ASA) Joel Leighton, who began reading from the pad of paper. ASA Leighton asked Galvan if it was accurate and Galvan said no. He asked about each statement on the pad of paper, and Galvan said no to each one. Then ASA Leighton left the room and Detective Switski pushed Galvan's head down on the table and told him it was the last time he was going to warn him. About an hour later, Detective

10

Switski and ASA Leighton reentered the room. This time, when ASA Leighton read from the paper, Galvan agreed to everything because he felt like "he had no choice." They then put him in a lineup. Galvan stated that ASA Leighton told him to repeat his statement to a woman who would type it all out.

¶ 32 Galvan was then asked if his trial testimony was all true, to which Galvan said it was. He stated that he did not testify at trial about Detective Switski punching and kicking him because his attorney had told him that the jury would not believe him.

¶ 33 Isaac, Galvan's brother, testified that he was arrested on the same day as Galvan, at their mother's house in Cicero. He testified that he could hear yelling, crying, and noises on the wall or table from Galvan's interrogation. Isaac testified that he was questioned for 11 hours before going to a lineup. At the lineup he saw Galvan, who looked "like a zombie" with red and bloodshot eyes and marks on his forehead.

¶ 34 Michael Almendarez testified that on the night of the fire, he was not with Galvan, petitioner, or Nanez and did not see Ramirez. Michael testified that nine months after the fire, police officers took him in for questioning. They handcuffed one arm to the wall and began pressuring him to confess to starting the fire. The police officers threatened his life, told him they were going to drop him off in a dangerous area, and they hit him "a couple of times, each of them did." Michael testified that they handcuffed him behind his back and took him to a rival gang's neighborhood and threatened to leave him there. Michael told them that he would confess, so the police officers brought him back to the station. Michael testified that he was questioned for hours at the police station and that police officers eventually wrote out a confession for him to sign that they fabricated. According to the statement, Galvan and Nanez told him that Nanez had thrown a bottle of gasoline against the side of house and that Galvan had

11

lit the gasoline with a match. Michael testified that Nanez did not in fact tell him any of that and that the police officers made that up. Michael said he signed the statement in order to "get out of there." Michael testified that the next morning, they brought him in front of a grand jury and he realized that he:

"had my opportunity to get out of this, and I turned to the Judge, and I told him everything that's on that paper, I did not write, they wrote it, they spoke it, they said it, the only thing true on there is my signature. And right there, he had told the typist to stop typing and to scratch that, told the officers to get me out of here, they grabbed me, they threw me on the street, and that was it."

¶ 35    Petitioner testified that on June 8, 1987, police officers came to his home and asked him if he was willing to go to the police station. He went willingly. Petitioner testified that he was taken to a small room at the police station where an officer backhanded him, grabbed him by the throat, and told him that if he cooperated, "this will all go smoothly." Petitioner testified that Detective Switski accused him of starting the fire, and that the police "had" somebody who had seen petitioner. Petitioner testified that Detective Switski put a hand on each of his shoulders and pushed, so that the desk chair petitioner was sitting in tilted back and his head hit the wall behind him. Petitioner stated that Detective Switski grabbed petitioner by the shirt, pulled him out of the chair, and pushed him onto the bench. Petitioner stated that Detective Switski said, "I don't care how long it takes, you're going to tell me what I want to hear."

¶ 36    Petitioner testified that Detective Hanrahan then entered the room and asked petitioner if there was anything he wanted to say about the night of the fire. Petitioner testified that he told him he did not know anything about it. Petitioner testified that Detective Hanrahan then said that he knew petitioner and Nanez were hanging out on 24th Street when Galvan walked up and told

12

them he wanted to burn down a house because he had been shot by some people living on 24th Place. Petitioner testified that he told Detective Hanrahan that never happened. Petitioner stated that Detective Hanrahan told him "somebody always cooperates, and usually it's the first one who does that gets to leave." Petitioner stated that Detective Hanrahan slapped him and left the room.

¶ 37 Petitioner testified that Detective Switski came back in and told him that Galvan had just told him that petitioner was the one who approached him and Nanez with a desire to burn down the house in question. Petitioner testified that he told Detective Switski that this was a lie and asked to make a phone call. Petitioner stated that Detective Switski told him he would have to tell him something because in the end it was either going to be petitioner's truth or Galvan's truth. Petitioner testified that he again said he did not know anything, and Detective Switski punched him on the side of the head. He asked petitioner, "How stupid are you?" and then left the room.

¶ 38 Petitioner testified that a woman carrying a court-reporting machine entered the room, and he tried to tell her what had happened, but she said he was lying and a murderer who was going to die.

¶ 39 Petitioner testified that Detective Hanrahan entered the room and told him that both Galvan and Nanez gave statements, neither one implicating petitioner. Petitioner testified that he asked if he could leave, and Detective Hanrahan told him only if he made a statement implicating the other two. Petitioner testified that when he questioned why he had to give a statement, Detective Hanrahan kicked him "in the balls" and asked him why he would not cooperate. Petitioner testified that Detective Hanrahan left and then came back in and said he hoped they had an understanding. Petitioner said Detective Hanrahan indicated that there was

13

someone at the police station to give petitioner a ride home, and then read from a piece of paper. The document he read stated that Galvan approached petitioner and Nanez and told them he wanted to burn down a house on 24th Place in retaliation for being shot. Petitioner stated that the document also stated that the three men went to a gas station where petitioner pumped gas into empty milk jugs. The document further stated that the three men walked into the alley, Galvan found an empty bottle that he filled with gasoline and then stuffed with a rag, and they all continued to walk down to the residence in question. Detective Hanrahan stated that petitioner saw Nanez light the rag and Galvan throw the bottle at the back of the house. When petitioner stated that he could not attest to the contents of the document, Detective Hanrahan again left him alone.

¶ 40     Petitioner testified that Detective Switski came back in and handcuffed petitioner's hands behind his back. He testified that Detective Switski told him to face the back of the elevator and that he felt an object like the barrel of a gun to the back of his head. Detective Switski stated that he could take him to the basement and shoot him in the head and no one would care. Detective Switski also said he would say that petitioner tried to escape. Petitioner testified that he then agreed to cooperate.

¶ 41     Petitioner testified that the elevator stopped and he was taken to be processed. He was not allowed to make a phone call. Detective Switski then brought petitioner back to the interrogation room and left after handcuffing him to the wall. Petitioner testified that Detective Hanrahan then came in with a yellow piece of paper and stated, "We'll just say that as you walked from the alley, you stopped before getting to the house while [Galvan] and Nanez kept going. After a few minutes, they came running past and told you to run." Detective Hanrahan stated that this would show that petitioner was not involved and that he was trying to get away from the other

14

perpetrators. Detective Hanrahan asked petitioner if he wanted his baby daughter to grow up calling someone else "dad" and then handed him the piece of paper and left.

¶ 42    Petitioner testified that Detective Switski then entered again and when petitioner denied knowing anything about the fire, Switski kicked his groin area until petitioner agreed to cooperate. Detective Switski then left again.

¶ 43    Petitioner stated that after some time, Detective Hanrahan brought him into a different room, where he met ASA Joel Leighton. Petitioner testified that he began to tell ASA Leighton that the police officers had been assaulting him throughout the day because he would not agree to make a statement, and that he had not been given a phone call. Petitioner stated that ASA Leighton responded by saying he had brought the wrong paperwork, and then left the room. As soon as the door was shut, Detective Hanrahan punched petitioner in the back of the neck and between the shoulders. Petitioner testified that ASA Leighton then knocked, and Detective Hanrahan told him to reenter the room. When petitioner tried to tell him what was happening, ASA Leighton got up and said he had forgotten his pen. Petitioner realized that ASA Leighton was only there to hear what the police officers wanted him to say. Petitioner testified that he began to cry when he was left alone with Detective Hanrahan for the second time and that Detective Hanrahan said he was not saying he participated in the offense, but that he was just asking petitioner to make a statement and that he could then go home.

¶ 44    Petitioner testified that ASA Leighton knocked on the door again and asked if everything was fine. He sat down and asked petitioner what he wanted to tell him. Petitioner said he did not remember, and Detective Hanrahan stated, "you told me you and Nanez were hanging out on 24th Street, and [Galvan] walked up and said he wanted to go burn a house on 24th Place because some guys who lived there shot at him a couple weeks back." ASA Leighton asked

15

petitioner if that was correct, and petitioner said yes. Petitioner testified that ASA Leighton continued to ask questions, and that Detective Hanrahan continued to prompt petitioner with answers. Upon completing the statement, ASA Leighton asked petitioner to sign each page.

¶ 45    Petitioner testified at the hearing that the statement he signed was not true. When he signed it, petitioner believed that the police wanted him to accuse his two codefendants and that they would let him go. Petitioner testified that he was not in the alley of West 24th Place on the date in question and he did not set fire to the building. Further, he did not help anyone start the fire and was not with anyone that set fire to the building.

¶ 46    Anselm Holman, Ritchie Cole, Kenneth Fisher, Freddie Halmon, and LaRoy Mitchell all testified that they confessed to false statements prepared for them by police officers after being interrogated by certain officers at Area 4 at around the same time as petitioner's interrogation. Holman testified that he was arrested in May 1984 when he was 17 years old for a burglary. One of the arresting officers was Detective Switski. Holman testified that he was handcuffed in a room and that the officers "became physical" with him. Detective Switski slapped him in the face and punched him in the chest. He was hit in the back of the head with a telephone book. Holman testified that the officers were telling him that he raped and strangled a woman, but that Holman had no idea what they were talking about. The officers prepared a statement and told him he could leave if he signed it. At that point, he had been at the station for more than 10 hours. The officers then asked Holman to sign a "curfew release." Holman signed and initialed where they told him to on the sheet of paper. Holman was then taken to jail, where he requested medical attention.

¶ 47    Holman further testified that he told his trial attorney about the abuse he suffered, and his trial attorney filed a motion to suppress the statement, but the trial judge did not grant it. Holman

was ultimately found guilty and sentenced to natural life in prison. Holman appealed his conviction, but his appellate counsel did not argue for suppression of his statement, and he lost his appeal. Holman ultimately filed a postconviction petition in which he argued that his statement was coerced, which was denied. Holman filed a successive postconviction petition, which was granted. His conviction was eventually overturned, but he pled guilty on remand so that he could get a shorter sentence. Holman stated that he was testifying because he wanted to testify to the mistreatment of and misconduct of Detective Switski and Detective Vucko and that he was not offered anything in exchange for his testimony.

¶ 48    Cole testified that in May 1984, when he was 16 years old, he was arrested for murder. Cole testified that Detective Switski "back-slapped" him, told him he would never see his school again, slapped him across the face, and kicked him in the buttocks. Cole testified that Detective Switski kicked him a second time and he fell to the floor. Cole testified that he was told to sign a statement and did so without reading it. Cole filed a motion to suppress and told the judge about the abuse but was ultimately convicted. Cole appealed and the statement was thrown out due to an illegal arrest. The charges against him were eventually dismissed. Cole testified that he was not offered anything in exchange for his testimony.

¶ 49    Fisher testified that he was arrested in May 1984, when he was 17 years old, for the murder and attempted rape of his cousin. Fisher admitted that he took part in the murder of his cousin, but denied that he sexually assaulted her. He stated that Detective Switski was one of the detectives that questioned him, and he was handcuffed to the wall during questioning. He stated that the detectives took turns hitting him and he eventually signed a statement that they wrote down for him. Detective Switski slapped him and punched him several times over the course of

the night. Fisher unsuccessfully argued at trial and on appeal that his statement should be suppressed. Fisher testified that he did not receive anything in exchange for his testimony.

¶ 50    Frank Cupello, a prosecution investigator, testified that he visited Fisher in jail in 2005 and his report reflected that Fisher described acts of physical abuse during his interrogations by officers, including Detective Switski.

¶ 51    Halmon testified that he was arrested in 1985 for murder. He was 21 years old at the time. Detective Switski and Detective Vucko handcuffed him to a wall, and he was beaten by both officers. The officers left a stack of paper for him to read and told him to memorize his statement. They repeatedly came into the room and took turns hitting him. After two and a half days, Halmon signed the statement the officers wanted him to sign. Halmon told his trial attorney about the beatings, and his trial attorney filed a motion to suppress his statement. The trial judge did not grant his motion. On direct appeal, Halmon was granted a new hearing on his statement, but the hearing was never held. Instead, he was offered a deal of 28 years in jail to plead guilty, which he accepted. He stated that during the time he had been in jail, he lost a lot of family members and he wanted to get out to see his remaining family. He did not know if the motion would get denied again and he would have to spend another 15 years in jail. By pleading guilty, he only had to serve 3½ more years in jail. When asked why he was testifying, Halmon stated that he wanted "the world to hear his story" and that he had not been offered anything in exchange for his testimony.

¶ 52    Mitchell, Halmon's codefendant, testified that he was arrested in 1985 for murder. Mitchell testified that two officers, including Detective Switski, handcuffed him to a wall at the police station and began questioning him. They showed him a piece of paper and told him to memorize the statement. They then began hitting Mitchell in the stomach and the legs. The

officers used club-like weapons to beat him. They told him he would never be able to see his family again if he did not agree to what was on the piece of paper. Mitchell testified that they left him alone with the statement and told him to memorize it. Later the next day, Detective Switski took him to a lineup and told him he had been pointed out in the lineup. They then asked Mitchell if he was ready to sign the statement, and when he said no, they began beating him again. Mitchell testified that he then told them what they wanted to hear because he thought he could go home afterwards. Instead, Mitchell was taken to jail. He told his public defender what happened and his attorney filed a motion to suppress. The motion was denied. Mitchell testified that he was found guilty at trial with no other evidence besides his statement and sentenced to 40 years in prison. Mitchell's conviction was reversed for a new suppression hearing, but he was offered a 23-year sentence if he pled guilty, which he accepted so that he could go home to see his family. Mitchell had been serving a 40-year sentence, so by accepting the 23-year sentence, he only had to serve 2½ more years in jail. Mitchell testified that he had not been offered anything in exchange for his testimony and that he chose to testify because he was "tired of this nightmare, and *** even when I'm on the streets, I see the police. They might stop me for no apparent reason."

¶ 53    Carnell Carey testified that he was arrested in March 1989 for murder and was physically abused by Detective Switski and one other officer. He testified that the officers slapped him in the face and kicked him in the leg. The officers punched and kicked him until he spit out blood. Carey testified that he complained about the abuse when he was taken to jail. Carey testified at a motion to suppress, but the motion was denied. He then pled guilty because he "didn't have a good legal defense." Carey testified that he wrote a letter to the Office of Professional Standards in 1990 and that an investigator contacted him within a week of receiving the letter. Carey

asserted that he was testifying at the evidentiary hearing in this case because "these officers need to be stopped. They could still be doing this here. I am not getting anything out of this. It's just that they been doing this for years to people, ain't nothing being done about it and they need to be stopped."

¶ 54    Carey's codefendant, Andre Slater, testified that he was arrested in February 1988 for murder. Slater testified that Detective Switski handcuffed him to a wall, slapped him several times, and punched him in the forehead and head. Slater testified that he was in custody for three days with nothing to eat and that on the third day he gave his statement. Slater testified that his lip was bloody, and his jaw was swollen when he went to jail. He told someone in the medical processing office at the jail what happened. Slater also told his attorney what happened and filed a motion to suppress his statement, but the motion was denied. His attorney advised him to plead guilty because he had been offered the minimum sentence. Slater stated that he agreed to testify at the evidentiary hearing because he wanted "some light to be shed on the situation."

¶ 55    Detective Victor Switski, now retired, denied having any memory of the investigation of the case at bar or of taking confessions from petitioner, the testifying witnesses, or other pattern witnesses. He testified that if his reports contained various facts about the investigations, then those facts were true. Detective Switski noted that prior to testifying at the evidentiary hearing, he had talked to Detective Vucko, but that did not refresh his memory. Detective Vucko, who had created reports after speaking to some of the witnesses in the case at bar, denied talking to Detective Switski before the evidentiary hearing and testified that the reports he reviewed did not refresh his recollection of the investigation.

¶ 56    ASA Leighton denied seeing injuries on Michael, Galvan, or petitioner.

¶ 57    Dr. Russell Ogle, a fire and explosion expert, testified that there was no evidence as to what started the fire in this case. However, Dr. Ogle testified that modern research shows a burning cigarette cannot ignite a flammable vapor. Dr. Ogle also testified that there was no way to determine where the fire started, and that the fire expert's testimony in petitioner's original trial that the fire started at the back of the first-floor porch was incorrect. Dr. Ogle testified that the most likely place for the fire to have begun was the stairwell.

¶ 58    The trial court issued a written order on December 15, 2016. In that order, the trial court found Partida's testimony to be "untruthful and not credible," based in part on the prior affidavits that Partida had executed in which he stated it was too dark to see the three individuals in the alley on the night in question. The trial court noted that Partida had also claimed in a letter appended to his 2001 affidavit that it was not possible to identify any of the men in the alley on the night in question due to the distance and darkness. The trial court stated that even if the affidavits had been prepared for him, the letter that he wrote in 2001 was not, and therefore he was either being dishonest then or he was being dishonest now. Consequently, the trial court found that the outcome of the case would not have been different if the jury had heard Partida's testimony and that such a conclusion prevented a finding that petitioner received ineffective assistance of counsel or that a new trial was warranted.

¶ 59    The trial court also found that any testimony adduced at the hearing regarding a threat made by Velez before the fire took place was not "newly discovered evidence" because it had been introduced at petitioner's trial. The trial court also found that the evidence constituted improper hearsay testimony and therefore could not constitute evidence of petitioner's innocence either then or now.

¶ 60    The trial court further found that after considering all the evidence presented, petitioner failed to meet the necessary burden of proof to entitle him to postconviction relief, and the proffered testimony in support of petitioner's claims of coercion "is not to be believed." This conclusion was based in part on the trial court's finding that petitioner was impeached by his 2001 affidavit describing the physical abuse he endured, which made no mention of Detective Switski and only focused on Detective Hanrahan. The trial court also noted that there were no injuries noted on petitioner's medical intake form, despite the "conscientious nature of the intake officer's work that day." The court stated that the "repeated and seemingly incessant blows purportedly rained upon petitioners" should have been visible in the photographs taken of them that night. The court concluded that "the timing as to the progress of the police investigation clearly refutes the claims by petitioners of hours and hours of abuse."

¶ 61    The trial court also found the "so-called" pattern evidence that was introduced was not convincing. Specifically, the trial court stated that it did "not believe any of these persons. They have all been adjudicated guilty of murder. Some have had their convictions reversed by the Illinois Appellate Court, but none have secured any ruling from the Circuit Court or the Appellate Court that their purported confessions were the product of coercion." The trial court stated, without elaboration, that Halmon had been impeached by his prior testimony at his hearing on a motion to suppress. It further stated that while Mitchell testified that he was beaten by a club, his testimony at a pretrial motion to suppress made no such claims about a club. Moreover, Carey did not mention he was spitting blood in his letter to the Office of Professional Standards, and Holman did not mention that he was told to memorize a written script in his motion to suppress hearing. The trial court also stated that Cole wrote two letters in 2005 stating that there had to be something in it for him to get involved and that Fisher's testimony was

impeached with his statement to an investigator from the ASA's office that no one coerced him to confess to the murder of his cousin. The trial court concluded that the testimonies of these people were not credible and

> "does not lead to any conclusion that [petitioner and Galvan] were coerced to confess their involvement in this case. Neither is this court convinced that had this so-called 'pattern' testimony been presented at [petitioner's and Galvan's] pretrial hearings on their motions to suppress their confessions, that such motions would have been granted."

¶ 62    Petitioner's postconviction petition was denied and he now appeals.

¶ 63                                   ANALYSIS

¶ 64    On appeal, petitioner's first argument is that the trial court's denial of petitioner's postconviction petition was manifestly erroneous where the trial court disregarded the evidence establishing that Area 4 detectives were engaged in a pattern of abuse to coerce confessions. Petitioner argued that this evidence of abuse would have impeached the detectives, and therefore the outcome of his suppression hearing would have been different. We recently addressed this very argument in petitioner's codefendant's case in *People v. Galvan*, 2019 IL App (1st) 170150. For the following reasons, we conclude that the trial court's findings following the third-stage evidentiary hearing were manifestly erroneous, and its judgment should be reversed.

¶ 65    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2012)) provides a statutory remedy for criminal defendants who claim their constitutional rights were violated at trial. *People v. Edwards*, 2012 IL 111711, ¶ 21. A postconviction proceeding is a collateral proceeding rather than an appeal of the underlying judgment and allows review of constitutional issues that were not, and could not have been, adjudicated on direct appeal. *People v. Towns*, 182 Ill. 2d 491, 502 (1998). "Thus, issues that were raised and decided on direct appeal are barred

23

from consideration by the doctrine of *res judicata*; issues that could have been raised, but were not, are considered waived." *People v. Pitsonbarger*, 205 Ill. 2d 444, 456 (2002) (citing *Towns*, 182 Ill. 2d at 502-03). Where a defendant presents newly discovered, additional evidence in support of a claim, collateral estoppel is not applicable because it is not the same "claim." *People v. Tenner*, 206 Ill. 2d 381, 397-98 (2002).

¶ 66    The Act provides three stages of review by the trial court. *People v. Domagala*, 2013 IL 113688, ¶ 32. At the first stage, the trial court may summarily dismiss a petition that is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2012). However, for a successive petition to even be filed, the trial court must first determine whether the petition (1) states a colorable claim of actual innocence (*Edwards*, 2012 IL 111711, ¶ 28) or (2) established cause and prejudice (*People v. Smith*, 2014 IL 115946, ¶ 34). Since a filed successive petition has already satisfied a higher standard, the first stage is rendered unnecessary and the successive petition is docketed directly for second-stage proceedings. *People v. Sanders*, 2016 IL 118123, ¶¶ 25-28; *People v. Jackson*, 2015 IL App (3d) 130575, ¶ 14 ("When a defendant is granted leave to file a successive postconviction petition, the petition is effectively advanced to the second stage of postconviction proceedings.").

¶ 67    At the second stage, the trial court must determine "whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." *People v. Edwards*, 197 Ill. 2d 239, 246 (2001). The petitioner's allegations are taken as true, and the question is whether those allegations establish or show a constitutional violation. *Domagala*, 2013 IL 113688, ¶ 35. "In other words, the 'substantial showing' of a constitutional violation that must be made at the second stage [citation] is a measure of the legal sufficiency of the

petitioner's well-pled allegations of a constitutional violation, which if proven at an evidentiary hearing, would entitle petitioner to relief." (Emphasis omitted.) *Id.*

¶ 68    If a defendant makes a substantial showing at the second stage, then the petition advances to a third-stage evidentiary hearing. *Id.* ¶ 34. At a third-stage evidentiary hearing, the trial court acts as factfinder, determining witness credibility and the weight to be given particular testimony and evidence and resolving any evidentiary conflicts. *Id.* The court may receive "affidavits, depositions, oral testimony, or other evidence" to weigh the merits of the petition and determine whether the defendant is entitled to relief. 725 ILCS 5/122-6 (West 2012). We review the circuit court's dismissal of a postconviction petition following an evidentiary hearing to determine whether it was manifestly erroneous. *People v. Morgan*, 212 Ill. 2d 148, 155 (2004). "Manifest error" is defined as "error which is ' "clearly evident, plain, and indisputable." ' " *Id.* (quoting *People v. Johnson*, 206 Ill. 2d 348, 357-60 (2002) (quoting *People v. Ruiz*, 177 Ill. 2d 368, 384-85 (1997))).

¶ 69    Here, petitioner claims that he presented newly discovered evidence revealing a pattern of abusive tactics employed by the officer who denied coercing a confession from petitioner. Under Illinois law, "a claim of newly discovered evidence showing a defendant to be actually innocent of the crime for which he was convicted is cognizable as a matter of due process." *People v. Washington*, 171 Ill. 2d 475, 489 (1996). The supporting evidence for a petition on the basis of actual innocence must be new, material, noncumulative, and of such conclusive character as would probably change the result on retrial. *Id.* New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. *People v. Burrows*, 172 Ill. 2d 169, 180 (1996). Material means the evidence is relevant and probative of the petitioner's innocence. *People v. Smith*, 177 Ill. 2d 53, 82-83

(1997). Noncumulative means the evidence adds to what the jury heard. *People v. Molstad*, 101 Ill. 2d 128, 135 (1984). And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result. *People v. Ortiz*, 235 Ill. 2d 319, 336-37 (2009).

¶ 70     As our supreme court has noted, the trial court should not redecide the petitioner's guilt in deciding whether to grant relief. *People v. Coleman*, 2013 IL 113307, ¶ 97. "Indeed, the sufficiency of the State's evidence to convict beyond a reasonable doubt is not the determination that the trial court must make. If it were, the remedy would be an acquittal, not a new trial." *Id.* "Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Id.*

¶ 71     In light of the evidence of the pattern of misconduct presented at the evidentiary hearing, the questions are (1) whether any of the officers who interrogated petitioner may have participated in systematic and methodical interrogation abuse and (2) whether those officers' credibility at petitioner's suppression hearing or at trial might have been impeached as a result. *People v. Patterson*, 192 Ill. 2d 93, 145 (2000). The issue is not whether the confession itself was voluntary, "but whether the outcome of the suppression hearing likely would have differed if the officer who denied harming the defendant had been subject to impeachment based on evidence revealing a pattern of abusive tactics employed by that officer in the interrogation of other suspects." *People v. Whirl*, 2015 IL App (1st) 111483, ¶ 80.

¶ 72     Petitioner has consistently argued at both his suppression hearing and at his trial that his confession was coerced. At the third-stage evidentiary hearing, petitioner testified that Detective Switski and Detective Hanrahan abused him during interrogations after his arrest. Petitioner

stated that he was punched, kicked, grabbed by the throat, handcuffed to a wall, threatened with a gun, and forced to sign off on a written statement that he did not create.

¶ 73    Holman, Cole, Fisher, Halmon, Mitchell, Carey, and Slater all testified that they were abused by Detective Switski during interrogations. Holman testified that Detective Switski slapped him in the face and punched him in the chest. Holman also testified that officers prepared a statement for him and told him he had to sign it. Holman signed it after more than 10 hours of interrogation. Cole testified that he appealed his conviction based on his coerced statement and that the appellate court threw his statement out. Cole's case was dropped on his motion to suppress because he was a minor questioned without his mother present. Fisher testified that Detective Switski slapped and punched him several times over the course of his interrogation and that he argued that his statement should be suppressed before trial and on appeal but lost. Halmon testified that he was beaten by Detective Switski and told to memorize a statement that had been prepared by police officers. Halmon testified that he signed the statement after 2½ days of questioning. Mitchell testified that he was beaten by Detective Switski with a club-like weapon. Mitchell also stated that he was hit on his stomach and legs and interrogated for over a day. He eventually signed a statement thinking he could leave afterwards. Carey testified that he was physically abused by Detective Switski and complained both when he was booked at the jail and in a letter to the Office of Professional Standards. Carey's codefendant, Slater, testified to similar experiences and recalled that he saw Carey with facial injuries in jail.

¶ 74    Detective Switski denied having any memory of the investigation or of taking confessions from petitioner, the testifying witnesses, or other pattern witnesses.

¶ 75    The trial court, after hearing testimony from these witnesses, stated:

"The court has listened carefully to their testimony in that regard and does not find it to be credible. *** This court does not believe any of these persons. They have all been adjudicated guilty of murder. Some have had their convictions reversed by the Illinois Appellate Court, but none have secured any ruling from the Circuit Court or the Appellate Court that their purported confessions were the product of coercion."

¶ 76    However, the credibility findings made by the court were not relevant to the issue at hand: whether any of the officers who interrogated petitioner may have participated in systematic and methodical interrogation abuse and whether those officers' credibility at petitioner's suppression hearing or at trial might have been impeached as a result. *Patterson*, 192 Ill. 2d at 145. Here, without petitioner's confession, the State's case was nonexistent. The witnesses all testified at the evidentiary hearing that they did not gain anything in exchange for their testimony, and several of the witnesses testified that while their convictions were reversed, they plead guilty as a direct result of the State's offer of a lesser sentence. The new evidence presented at the postconviction hearing, when weighed against the State's original evidence, was conclusive enough that the outcome of the suppression hearing likely would have been different if Detective Switski had been subject to impeachment based on evidence of abusive tactics he employed in the interrogation of others. *Whirl*, 2015 IL App (1st) 111483, ¶ 113. Therefore, the trial court's opposite conclusion was manifestly erroneous, and we reverse and remand with directions that petitioner receive a new suppression hearing and, if necessary, a new trial.

¶ 77                             CONCLUSION

¶ 78    For the foregoing reasons, we reverse the trial court's dismissal of petitioner's third-stage successive postconviction petition and remand for a new suppression hearing and, if necessary, a new trial.

¶ 79    Reversed and remanded for further proceedings.