NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances
allowed under Rule 23(e)(1).

2024 IL App (4th) 230192-U

NO. 4-23-0192

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 16, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Boone County |
| DOUGLAS A. VALENTINE, | ) | No. 18CF362 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | C. Robert Tobin III, |
| | ) | Judge Presiding. |

---

JUSTICE VANCIL delivered the judgment of the court.
Justices DeArmond and Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err when it summarily dismissed a postconviction petition at the first stage of proceedings where defendant failed to show he was arguably prejudiced by alleged ineffective assistance of his trial counsel and postconviction counsel.

¶ 2    After a jury trial, defendant, Douglas A. Valentine, was found guilty of two counts of criminal sexual assault and four counts of aggravated criminal sexual abuse. The Appellate Court, Second District affirmed defendant's convictions on direct appeal. *People v. Valentine*, 2021 IL App (2d) 200701-U. Defendant subsequently filed a postconviction petition. The trial court dismissed the petition at the first stage of proceedings. Defendant now appeals.

¶ 3                      I. BACKGROUND

¶ 4    Defendant's convictions arise from a series of interactions between himself and M.B., a minor. Defendant met M.B.'s family in 2011, when they joined the Ski Broncs water ski team, of which he was a member. Over time, defendant became close with the family. He did some construction work at the family's house, and, starting in 2016, he began spending time with the family as a friend. Defendant would come to the house a few times a week, bring the children home from Ski Broncs practice, and often do various activities with the children.

¶ 5    In September 2018, defendant went to the house to spend time with the family, and at some point, M.B.'s mother heard defendant's voice coming from the second floor, which she thought was odd. She went upstairs and found defendant standing just inside the doorway of M.B.'s bedroom. She eavesdropped on the conversation and overheard defendant say, "What the F," then later say, "I really wanted to buy you that dress," and, "It was short and when you danced, I'm sure everyone could see your who ha." M.B.'s mother stated the conversation sounded like two teenagers talking to each other and that it raised red flags.

¶ 6    M.B.'s father eventually came upstairs and saw defendant in M.B.'s room. He went into his bedroom and found his wife sitting in the dark. She told him to listen to M.B. and defendant's conversation, but they could not understand any more of it. M.B.'s father then told defendant he had to leave. The next day, M.B.'s mother read through text messages between M.B. and defendant on M.B.'s phone. She testified the content of the messages did not bother her, but the quantity of them made her uneasy. After that day, defendant was not invited to the house anymore, and M.B. was not allowed be alone with him.

¶ 7    In October 2018, M.B.'s parents were returning from a walk when they saw M.B. and some of her friends from the ski team talking outside their house. M.B.'s parents went inside the house, but her father went back out to get one of the ski team members to discuss team matters.

When they were away from the group, M.B.'s father was told he needed to talk to his daughter. He went outside and asked M.B. if there was anything she needed to tell him. M.B. stated she felt more comfortable telling her mother. After M.B. spoke with her mother, the parents called the police. Defendant was later charged with three counts of criminal sexual assault and five counts of aggravated criminal sexual abuse arising out of his interactions with M.B.

¶ 8                                                A. Evidence at Trial

¶ 9            M.B. testified she first met defendant through the Ski Broncs in 2011 but did not start interacting with him until 2016, when he started spending more time with her family. She stated that by spring 2018, he was a "family friend." Defendant corroborated that the two became great friends by 2018. M.B. stated her relationship with defendant changed in May 2018, when he invited her to go rock climbing with him at Vertical Endeavors. According to M.B., while there, defendant commented "age is just a number" and "25 years is just how many times the earth has been around the sun." Defendant was 39 at the time, and M.B. was 14. Defendant acknowledged having a conversation about age but said this was about the need for skiers of different ages to build comradery. The two left, went to a mall, and during the drive, defendant took her arm and rubbed it against his beard, saying, "[T]his is what it would feel like if I was teasing you and everything."

¶ 10           At trial, M.B. recalled five incidents in which she engaged in sexual activity with defendant. Defendant was only charged in connection with two: the "cul-de-sac incident" and the "Boone County Fair incident." Defendant confirmed they were together on each occasion but denied any inappropriate conduct occurred between the two at any time.

¶ 11           Around the beginning of June 2018, defendant invited M.B. to go shopping with him after practice. She wanted to go home and shower first, but defendant offered to take her back

- 3 -

to his residence to shower because he needed to get work done. After M.B. showered, defendant showed her a stripper pole he had in his house. M.B. explained she had previously mentioned to him she wanted a stripper pole to practice different positions for the ski team, and he told her he had one. Defendant showed her tricks he could do on the pole, then M.B. began doing tricks on the pole separately. While she was on the pole, defendant grabbed her by the waist, laid her on the ground, got on top of her, and started kissing and running his hands over her body. At one point, he asked if she wanted him to continue. M.B. testified she said "yes," because she liked the attention. Her clothes remained on the whole time.

¶ 12        Defendant testified that he and M.B. went shopping after ski practice on that date but never stopped at his house. He stated M.B. had only been to his house twice, once to help him practice with his doubles partner, and another time when he stopped to get a jacket, but she did not go inside. He acknowledged having a stripper pole to use for exercise and stated he once mentioned having a pole to M.B. when she joked about wanting to become a stripper.

¶ 13        Around midnight one evening in June 2018, M.B. testified she messaged defendant and invited him to come smoke marijuana with her. Defendant parked a few houses down from her house, and she went out to meet him. They drove to an empty circle in a different part of the subdivision and parked by some bushes. According to M.B., after smoking marijuana, they started kissing and he fondled her breasts. She testified he took her pants off and placed his fingers in her vagina. She initially testified he placed his mouth on her vagina but later stated she did not remember whether his mouth touched her vagina. After a while, she asked him to stop because it was starting to hurt, and the night was getting late.

¶ 14        Defendant confirmed M.B. invited him to come over to smoke marijuana. He explained he was concerned for her and decided it was in her best interest that he, as a friend of

- 4 -

her parents, go so she would not invite someone else. He thought about calling her father, but he could not find the opportunity to do so without her finding out. He picked her up and they drove to a cul-de-sac, where she alone smoked marijuana. He denied smoking anything. Defendant then testified that, at some point, while M.B. was lying across the front seat of his truck with her head on his thigh, she pulled down her pants and offered to have sex with him. He refused, which made her angry.

¶ 15        M.B. also testified that in July 2018, she went to defendant's home to help him and his doubles partner from the ski team practice for an upcoming competition. After they finished practicing and defendant's partner left, M.B. asked defendant for a heating pad because she was on her period and was uncomfortable. Defendant asked her if "she ever got horny on her period," and she said yes. He then asked if she wanted to mess around, and she replied yes. He carried her to his bedroom, took off her shirt, kissed her, and played with her breasts. He took off her bottoms but left her underwear on and kissed her inner thighs and rubbed his penis between her legs. Regarding this occasion, defendant testified that, after he gave M.B. a heating pad, she went to his living room couch while he worked in his office. After a while, she wanted to leave and asked him to carry her to the car, which he did.

¶ 16        In August 2018, M.B. testified she went to the fair with her sister and her sister's friends. At the fair, she left her sister and went off with her best friend. She arranged to meet with defendant, who brought money for her. She invited him to stay at the fair with her because she felt bad for him after he drove there. They eventually left the fair together and went to his truck. He asked her if she wanted to go home or stay and mess around. She said she wanted to mess around. They drove to an empty area of the parking lot and parked. They kissed, and he fondled her breasts

and placed his fingers in her vagina. M.B. received a text message from her father asking when she was coming home, and defendant then took her home.

¶ 17　　　　Defendant stated he was at M.B.'s family's house when the girls went to the fair. M.B.'s father was going to give M.B. some money, but she left before he could. Defendant texted her to let her know she had forgotten the money and asked him to bring it to her. He met up with her and her friend and stayed with them at the fair. Afterwards, he dropped M.B. off at home. As he was driving home, he received a text message from M.B.'s father, who did not realize M.B. had already been dropped off, asking if they were on their way home yet.

¶ 18　　　　Later in August 2018, M.B. testified she went with defendant to Six Flags. Defendant invited M.B. and her sister, but she did not tell her sister about the invitation. M.B. testified that, on the drive there, she and defendant discussed "road head," which meant performing fellatio on him while he was driving, which the two then took part in. Upon arriving, they kissed in the parking lot, then went into the park. After leaving Six Flags, they went to a Walgreens to get Advil because defendant told her he had "blue balls." They then began messing around in his truck while in the Walgreens parking lot. Defendant kissed M.B.'s breasts, then placed his fingers in her vagina while she stroked his penis. Eventually, he flipped her over and ejaculated on her back. M.B. asserted that was the last time she engaged in any sexual activity with defendant. After this incident, M.B. decided she did not want to mess around with defendant anymore and started distancing herself from him.

¶ 19　　　　Regarding the trip to Six Flags, defendant testified he was going to take M.B. and her sister, but her sister backed out. On the drive there, M.B. mentioned she wanted to learn how to give oral sex and repeatedly asked defendant to let her try it on him, but he refused. Defendant

explained they went to Walgreens to get ibuprofen because they both had headaches from the amusement park rides.

¶ 20     M.B. additionally testified that, sometime in September 2018, defendant took her shopping for a homecoming dress. According to M.B., when she found a dress that she liked, defendant offered to buy it for her, but only if she went back to his house. She declined his offer. Defendant testified he took M.B. shopping for a homecoming dress because she had previously complained about wearing hand-me-down dresses. In the end, he chose not to buy her a dress because her parents already paid to have a dress altered, and he did not want to buy a new one without their permission. Defendant also testified he went to see M.B. on September 30, 2018, because he was concerned about her after learning she came home from homecoming high. He stated he was worried about her getting a "reputation." He did not recall talking with her about her homecoming dress but acknowledged he might have, as he felt her dress was too short.

¶ 21     At trial, the prosecution introduced numerous text messages between M.B. and defendant from the period from February 14, 2018, through October 5, 2018. M.B. testified she and defendant used the Snapchat app to have sexual conversations because the messages in Snapchat are not saved. On cross-examination, she acknowledged she was previously untruthful in an interview when she asserted that most, if not all, of her communication with defendant was via regular text messages. No DNA or other scientific forensic evidence was introduced. When asked about the large volume of text messages, defendant explained he gave M.B. a lot of attention to distract her from the "bad" attention she was getting. He stated he complimented her on her looks often because she lacked self-esteem, and he was trying to build her confidence.

¶ 22                    B. Jury Instructions

¶ 23    At the jury instruction conference, the parties discussed how to instruct the jury on other-crimes evidence where some came in for any reason and some came in for a limited purpose. Defense counsel agreed that the first incident with the stripper pole did not establish a propensity because it was not an act that was criminal in nature or otherwise reprehensible, but that it laid a foundation for "state of mind." The court then stated that the incidents at Six Flags and Walgreens were both admitted under section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2018)), and therefore, were not subject to a limiting instruction because the incidents could be used for any relevant purpose. The court offered to use the limiting instruction for the first incident regarding the stripper pole, but defense counsel stopped the court because she was concerned it would highlight the incident, which she believed would be more prejudicial to defendant. The court agreed and instead decided the second paragraph would be removed from the instruction and that the State was barred from alleging the stripper pole incident could be used for anything other than foundation for the relationship, as well as motive, intent, and state of mind.

¶ 24    In the end, the parties agreed to the following modified version of Illinois Pattern Jury Instructions, Criminal, No. 3.14 (approved Oct. 17, 2014):

> "Evidence has been received that the defendant has been involved in offenses or conduct other than that charged in the indictment.
>
> It is for you to determine what weight should be given to this evidence."

¶ 25                                C. Posttrial

¶ 26    Ultimately, the jury found defendant guilty of two counts of criminal sexual assault and four counts of aggravated criminal sexual abuse, and he was sentenced to 19 years in prison. Defendant filed a posttrial motion arguing, among other things, the evidence did not prove beyond

a reasonable doubt that he held a position of trust, authority, or supervision in relation to M.B. The trial court denied the motion. Defendant's motion to reconsider his sentence was also denied.

¶ 27 On direct appeal, defendant argued that (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the trial court erred when it granted the State's motion to bar testimony regarding M.B.'s prior allegedly false accusation of sexual assault against a third person; (3) the trial court erred when it barred defendant from cross-examining M.B. regarding her relationship with another man pursuant to section 115-7 of the Code (725 ILCS 5/115-7 (West 2018)), where cross-examination was necessary under the confrontation clause of the sixth amendment (U.S. Const., amend. VI); (4) the trial court erred in admitting unduly prejudicial evidence of prior bad acts; (5) COVID-19 safety protocols violated defendant's sixth amendment rights; and (6) defendant received ineffective assistance of counsel when trial counsel failed to move for a directed verdict. The Second District affirmed the trial court, and the Illinois Supreme Court denied defendant's petition for leave to appeal.

¶ 28 Defendant later filed a postconviction petition through private counsel. The petition was supported with an affidavit from defendant. The trial court summarily dismissed defendant's petition on February 9, 2023. Defendant filed a timely notice of appeal.

¶ 29 II. ANALYSIS

¶ 30 On appeal, defendant advances two arguments as to why the trial court should not have summarily denied his postconviction petition. First, defendant argues he made arguable showings that his attorney at trial and on direct appeal provided ineffective assistance. Second, defendant argues his postconviction attorney provided ineffective assistance and failed to raise an issue that would have survived first-stage proceedings. We address each argument in turn.

¶ 31 A. Ineffective Assistance of Trial and Appellate Counsel

¶ 32    A trial court's decision to dismiss a postconviction petition at first-stage proceedings is reviewed *de novo*. *People v. Allen*, 2015 IL 113135, ¶ 19, 32 N.E.3d 615.

¶ 33    The Post-Conviction Hearing Act (Act) provides a three-stage process for an imprisoned person to raise a constitutional challenge to a conviction or sentence. 725 ILCS 5/122-1 *et seq*. (West 2022); *People v. Hatter*, 2021 IL 125981, ¶ 22, 183 N.E.3d 136. Here, defendant's postconviction petition was dismissed at the first stage of the proceedings. At this stage, the trial court reviews the petition independently within 90 days after it is filed and docketed. 725 ILCS 5/122-2.1(a)(2) (West 2022). The threshold for a petition to survive summary dismissal at the first stage of the proceedings is low, given that most postconviction petitions are drafted by *pro se* petitioners with little legal knowledge or training. *Hatter*, 2021 IL 125981, ¶ 23. Petitions at the first stage that are prepared by privately retained counsel are subject to the same low-threshold standard. *People v. Tate*, 2012 IL 112214, ¶¶ 11-12, 980 N.E.2d 1100. A trial court will only summarily dismiss the petition if it is "frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2022). A petition is "frivolous or patently without merit" if it "has no arguable basis either in law or in fact." *Hatter*, 2021 IL 125981, ¶ 23. A petition that lacks an arguable basis in law or in fact is one "based on an indisputably meritless legal theory or a fanciful factual allegation." *Id*. The allegations of a petition are taken as true and are liberally construed, and they must present the gist of a constitutional claim. *Id*. ¶ 24. As such, "to survive summary dismissal, a petitioner is only required to include a limited amount of detail and need not present formal legal arguments or citations to legal authority." *Id*.

¶ 34    Defendant advances two ineffective assistance of counsel arguments. A claim of ineffective assistance of counsel is reviewed under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under that standard, a petitioner must show counsel provided

deficient performance, resulting in prejudice to the defense. *Id*. at 687-88. However, "at first stage postconviction proceedings, a petition alleging ineffective assistance of counsel may not be summarily dismissed if (1) counsel's performance *arguably* fell below an objective standard of reasonableness and (2) the petitioner was arguably prejudiced by the deficient performance." (Emphasis added.) *Hatter*, 2021 IL 125981, ¶ 25. Failure to satisfy either prong of the test precludes a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 694.

¶ 35                                   1. *Failure to Investigate and Introduce Evidence*

¶ 36        Defendant first argues he received ineffective assistance when his trial counsel failed to investigate M.B.'s previous denial that defendant had done anything inappropriate. Second, defendant argues that trial counsel was ineffective by failing to introduce evidence of a conversation between M.B. and her friend that could have undermined the credibility of M.B.'s allegations.

¶ 37        In his affidavit, defendant asserts that during the time M.B. claimed there was a sexual relationship between her and defendant, there were rumors that he had previously engaged in inappropriate behavior with minors. These rumors were investigated and were determined to be unfounded. M.B.'s father was a member of the body conducting the investigation, and he asked M.B. if she had any knowledge of inappropriate behavior by defendant. M.B. denied any such knowledge. Defendant later told his trial counsel about this and asked him to investigate, but counsel did not.

¶ 38        Attached to his petition, defendant included copies of a text conversation between M.B. and her friend. This conversation occurred after the Six Flags incident. In the conversation, the two joked about becoming strippers, and M.B. mentioned she knew someone with a stripper pole, and that they should go use it. The friend responded that the owner of the pole would want

to watch them, and M.B. responded, "Nah." Defendant's theory is that this evidence would have aided his defense by undermining the credibility of M.B.'s allegations against him, as M.B. would not recommend to her friend that they go to defendant's house if her allegations against him were true. Additionally, defendant asserts this conversation shows M.B. did not consider him a threat. M.B. testified that after the Six Flags trip, she distanced herself from defendant. According to defendant, the text conversation contradicted that testimony.

¶ 39        Even assuming, *arguendo*, that counsel's performance was deficient, defendant was not arguably prejudiced as there was overwhelming evidence against him in this case. As such, his ineffective assistance claim is meritless. "[I]f an ineffective-assistance claim can be disposed of because the defendant suffered no prejudice, we need not determine whether counsel's performance was deficient." *People v. Bowens*, 2017 IL App (4th) 150830, ¶ 39, 78 N.E.3d 1058. Specifically, trial counsel had already elicited testimony establishing M.B. lied on other occasions, including to her parents and to the victim sensitive interviewer, regarding her relationship with defendant. Evidence also showed that she lied to her parents about sneaking out of the house to meet up with a 19- or 20-year-old man. M.B. testified that one of the reasons she lied was because she did not want her parents to hate her, or, on the other hand, she was worried they would not believe her. We find that the admission of additional examples of lying would have little evidentiary value, as the same motivation and reasoning would explain the underlying behavior, and any such value would have been outweighed by the overwhelming evidence against defendant. Moreover, whether M.B. thought defendant was a threat is irrelevant.

¶ 40        Additionally, when M.B. was testifying regarding the Six Flags trip, defendant's trial counsel attempted to rebut M.B.'s testimony that she tried to distance herself from defendant after the incident. Trial counsel established M.B. continued to communicate with defendant and

allowed him to take her shopping. Counsel elicited testimony from M.B. that she went dress shopping with defendant and allowed him to pay for the dress. The State asserts that due to her familial relationship with defendant, M.B. could not completely sever ties with him. According to the State, cutting ties with defendant would have also made her parents suspicious, which she wanted to avoid. Therefore, we find that any further rebuttal would not likely have advanced defendant's case, as this argument was essentially raised by trial counsel.

¶ 41　　　　Further, the trial court, following the Second District's decision in the direct appeal on a similar issue, although involving a different witness, found that the text conversation was inadmissible to show "evidence of specific past instances of untruthfulness." While the Second District was referencing the testimony of another witness, not M.B.'s, the court reiterated that the "proper procedure for impeaching a witness's reputation for truthfulness is through the use of reputation evidence" and not through "evidence of specific past instances of untruthfulness." *Valentine*, 2021 IL App (2d) 200701-U, ¶ 90 (citing *People v. Cookson*, 215 Ill. 2d 194, 212, 830 N.E.2d 484, 495 (2005)). As such, it is unlikely defendant would have been able to introduce past instances of M.B. lying for the purpose he asserts.

¶ 42　　　　After reviewing the record in this case, we find the evidence against defendant was not closely balanced. To the contrary, the evidence was overwhelming, such that counsel's allegedly deficient performance was not prejudicial. M.B. testified to five separate sexual encounters with defendant, including incidents at his house, in a cul-de-sac near her house, and during the trip to Six Flags. Additionally, the evidence showed her family forged a relationship with defendant through the ski team, and he was a close family friend. Even defendant admitted being with M.B. in each of the instances she testified about. Moreover, volumes of text messages were admitted into evidence relating to the interactions between defendant and M.B. Defendant

argues that the evidence was "closely balanced," and that the case ultimately came down to a credibility determination between defendant and M.B. However, M.B.'s testimony alone was sufficient to support the jury's verdicts, even though there was additional evidence in the form of text conversations. See *People v. Harris*, 2018 IL 121932, ¶ 27, 120 N.E.3d 900 ("This court has consistently held that the testimony of a single witness is sufficient to sustain a conviction if the testimony is positive and credible, even if it is contradicted by the defendant.").

¶ 43       Thus, we find it is not reasonably probable that the result of the proceeding would have been different had counsel taken the actions defendant asserts here. Therefore, this claim fails.

¶ 44                    2. *Failure to File a Pretrial Motion*

¶ 45       Defendant also argues that his trial counsel was ineffective for failing to file a pretrial motion to dismiss based on failure of the indictment to state an offense. Specifically, defendant contends the indictment did not comply with section 111-3 of the Code (725 ILCS 5/111-3 (West 2018)) because it did not sufficiently state the nature and elements of the alleged criminal sexual assaults. Defendant asserts the indictment failed to allege facts concerning the nature of the relationship between him and M.B. Section 111-3(a) requires that a charge must be in writing and allege the commission of an offense by stating the name of the offense, citing the statutory provision alleged to have been violated, setting forth the nature and elements of the offense charged, stating the date and county of the offense, and stating the name of the accused, if known. 725 ILCS 5/111-3(a) (West 2018).

¶ 46       Defendant was charged with criminal sexual assault pursuant to section 11-1.20(a)(4) of the Criminal Code of 2012, which provides:

"A person commits criminal sexual assault if that person commits an act of sexual penetration and *** is 17 years of age or over and holds a position of trust, authority, or supervision in relation to the victim, and the victim is at least 13 years of age but under 18 years of age." 720 ILCS 5/11-1.20(a)(4) (West 2018).

The statute does not define what constitutes a position of trust, authority, or supervision. "Where the statute does not define or describe the act or acts constituting the offense, a charge couched in the language of the statute is insufficient. Rather, the facts that constitute the crime must be specifically set forth." *People v. Redwood*, 335 Ill. App. 3d 189, 193, 780 N.E.2d 760, 764 (2002) (citing *People v. Nash*, 173 Ill. 2d 423, 429, 672 N.E.2d 1166, 1169 (1996)); see *People v. Sparks*, 221 Ill. App. 3d 546, 549-550, 582 N.E.2d 314, 317 (1991) (dismissing a charge alleging criminal sexual assault where it did not define the "position of trust" the defendant held in relation to the victim).

¶ 47    The State contends this argument is barred by the doctrine of invited error, or alternatively, that counsel employed a reasonable trial strategy that foreclosed the argument. The State leans on the trial court's memorandum decision. There, the court stated defendant's strategy was an "all or nothing strategy" and that defendant maintained his defense that he "did not do anything sexual with the alleged victim." The State and the court reasoned that defendant was not surprised by the State's arguments at trial and testified to the relationship between him and M.B. The State argues defendant's testimony throughout the trial indicated he consented to the trial strategy.

¶ 48    While it is true that at first-stage proceedings, considerations of trial strategy are not proper, we nevertheless hold that defendant was not prejudiced because there is a reasonable probability that the State would have cured the defect upon any such motion being filed by

defendant. Both parties continued with the trial despite any defect. We find it is not reasonably probable that the result of the proceeding would have been different had defendant filed a pretrial motion to dismiss.

¶ 49       Defendant also argues his appellate counsel was ineffective for failing to raise the defective-indictment argument on direct appeal. However, we need not reach this issue, as we find that the underlying conduct does not prejudice defendant.

¶ 50                          3. *Ineffective Assistance of Appellate Counsel*

¶ 51       Defendant argues appellate counsel was ineffective for failing to raise on direct appeal the issue that the evidence at trial was insufficient to establish that he held a position of trust, authority, or supervision in relation to M.B. The parties agree this issue is not barred by *res judicata*, as the trial court so held. As such, we will address the merits of the ineffective assistance argument.

¶ 52       Claims of ineffective assistance of appellate counsel are governed by the two-pronged *Strickland* test. *People v. Johnson*, 206 Ill. 2d 348, 378, 794 N.E.2d 294, 312 (2002). Where the underlying claim lacks merit, a defendant cannot be said to have received ineffective assistance for appellate counsel's failure to raise the claim on appeal. *Johnson*, 206 Ill. 2d at 378, 794 N.E.2d at 312. To determine whether it is arguable that appellate counsel's failure to challenge the sufficiency of the evidence amounts to ineffective assistance, the court must review the potential merits of the underlying sufficiency of the evidence claim. See *People v. Moore*, 177 Ill. 2d 421, 428, 686 N.E.2d 587, 591 (1997); *People v. Easley*, 192 Ill. 2d 307, 329, 736 N.E.2d 975, 991 (2000). When presented with a challenge to the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any

rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. *People v. Breshears*, 2023 IL App (4th) 220947, ¶ 34.

¶ 53　　　　Defendant argues there was no evidence that he held a position of trust over M.B. or had any power over her that made her more vulnerable to him than anyone else. Instead, defendant contends that M.B. viewed him as a peer. Defendant maintains that he was not her coach on the ski team and no evidence was presented to show that he had any power to command her. While he took her places, defendant maintains it was as a friend or peer and not as a babysitter or chaperone. We disagree.

¶ 54　　　　Defendant believes this issue must be analyzed from M.B.'s perspective alone. Defendant relies upon *People v. Reynolds*, 294 Ill. App. 3d 58, 66, 689 N.E.2d 335, 340 (1997), for the proposition that "[t]he language of the statute does not suggest that the position of trust, authority or supervision may result from the role of the offender alone, but that it must exist 'in relation to the victim.' " However, this is a misreading of *Reynolds*. *Reynolds* simply stated that the analysis must correlate to the circumstances related to the defendant and the victim. Indeed, the court in *Reynolds* stated, "We agree with [the] defendant that his role as a public official does not alone create a position of trust, authority[,] or supervision," but "there was ample evidence introduced at trial to support a finding that [the] defendant developed a position of trust, authority or supervision in relation to [the victim]." *Id*. The court noted circumstances such as serving as the victim's mentor, arranging for her enrollment in a school, telling her he would pay her tuition, giving her money when they were together, and essentially serving as her parent in the eyes of the school. *Id*. We also note that, "[a]lthough a 'position of supervision,' considered in the context of its relation to children, may contemporaneously encompass aspects of 'trust' and 'authority,' we also believe that the common meaning of the phrase applies in those situations in which an

individual is an overseer, caretaker or chaperone of the child." *People v. Kaminski*, 246 Ill. App. 3d 77, 81, 615 N.E.2d 808, 811 (1993). Indeed, the mere fact that defendant was an adult and M.B. was minor *alone* is insufficient. However, there is ample evidence here to support a finding that defendant developed a position of trust, authority, or supervision in relation to M.B.

¶ 55      The record is replete with evidence that defendant served as a mentor, chaperone, supervisor, and family friend. The evidence showed, among other things, that defendant would take M.B. and her siblings on outings, such as off-road trucking or to get ice cream. Defendant also chaperoned M.B. on various occasions, including taking her rock climbing and to Six Flags, where he was the only adult with her. Defendant had also been responsible for driving her home from ski team practice. In these situations, it is clear he was responsible for transporting her safely and overseeing her well-being because she was a minor. M.B.'s father allowed defendant to drive M.B. even though she was only 14 years old, and he allowed defendant to do so because they had welcomed him into their family.

¶ 56      The record shows defendant had a strong bond with M.B.'s family. Defendant's years long friendship with M.B.'s family is also strong evidence of "a circumstance likely to generate mutual trust," which was demonstrated on the numerous occasions defendant was entrusted to be alone with M.B. See *People v. Secor*, 279 Ill. App. 3d 389, 394, 664 N.E.2d 1054, 1057 (1996). Defendant saw himself as "part of the family" and someone who M.B.'s parents "thought would protect her." Defendant stated that he "tried hard to be a big brother, an uncle, a protector, whatever I needed to be." Defendant testified he viewed his relationship with M.B. as "[s]ometimes as a teammate, sometimes as a niece, sometimes kind of like a daughter."

¶ 57      Defendant contends that the State's position is tantamount to arguing that all adults are in a position of trust, authority, or supervision when they accompany a minor anywhere. This

is an overgeneralization. Based upon the record, it is clear defendant served at least as a supervisor to M.B. when he was solely responsible for her care. This is not a case where an adult simply accompanied a minor on various excursions. As such, appellate counsel was not ineffective for failing to raise the issue on direct appeal, as it did not arguably prejudice defendant.

¶ 58                B. Ineffective Assistance of Postconviction Counsel

¶ 59        Defendant argues his postconviction counsel provided unreasonable assistance where counsel was unfamiliar with the trial record and failed to argue trial counsel was ineffective for agreeing to an improper jury instruction on other-crimes evidence. As defendant concedes, because the Six Flags incident and double's practice incident were admissible under section 115-7.3, he was not entitled to a limiting instruction. The incident regarding the stripper pole at defendant's home was admitted under Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011) for the limited purpose of providing context and showing state of mind. Defendant contends that the jury instruction given regarding the last event was improper. Defendant supports this argument with an example of postconviction counsel's unfamiliarity with the record.

¶ 60        The right to counsel in postconviction proceedings is based in statute—not the federal and state constitutions. See 725 ILCS 5/122-4 (West 2022). Therefore, postconviction petitioners are only guaranteed the level of legal assistance required by the Act. *People v. Owens*, 139 Ill. 2d 351, 364, 564 N.E.2d 1184, 1189 (1990). The Act does not require that postconviction counsel provide more than a " 'reasonable' level of assistance. *People v. Wright*, 149 Ill. 2d 36, 64, 594 N.E.2d 276, 288 (1992). Regardless of whether postconviction counsel was appointed or retained, the applicable standard for the level of representation that must be provided to a defendant remains the same pursuant to the Act, *i.e.*, reasonable assistance of counsel. *People v. Cotto*, 2016 IL 119006, ¶ 42, 51 N.E.2d 802.The question of whether the defendant was provided with a

reasonable level of assistance is reviewed *de novo*. *People v. Wallace*, 2018 IL App (5th) 140385, ¶ 31, 100 N.E.3d 621. When a defendant claims that retained postconviction counsel deficiently performed his duties or otherwise failed to provide reasonable assistance, a *Strickland*-like analysis should be used. *People v. Zareski*, 2017 IL App (1st) 150836, ¶ 59, 84 N.E.3d 527. Such an analysis requires an evaluation of whether the defendant suffered prejudice from the alleged failings of his retained counsel. *Id.* ¶¶ 59, 61.

¶ 61        We find that it is not *arguable* that postconviction counsel's performance was unreasonable where the record positively rebuts defendant's argument his trial counsel was ineffective. His trial counsel strategically did not want the limiting instruction given, so as not to "highlight" that piece of evidence over others. The decision to forgo tendering a limiting instruction to avoid highlighting certain evidence has been found to be a reasonable trial strategy that will not support an ineffective assistance of counsel claim. See *People v. Logan*, 2011 IL App (1st) 093582, ¶ 51, 954 N.E.2d 743 (finding trial counsel was not ineffective for failing to tender a limiting instruction where counsel made a strategic decision not to do so to avoid having the jury focus on certain evidence). Even assuming, *arguendo*, trial counsel's performance was deficient, defendant was not prejudiced, as the record shows there was overwhelming evidence against him. As previously stated, the evidence was not closely balanced in this case. Any limiting instruction would have informed the jury that not only were they to assign weight to the evidence as they saw fit, but they were also to determine its credibility. We cannot see how defendant could have been prejudiced by trial counsel's decision in the face of the evidence presented against him.

¶ 62        In sum, because defendant's assertion of trial counsel's ineffectiveness fails, postconviction counsel's performance was not unreasonable, as he was not deficient for failing to raise trial counsel's alleged ineffectiveness.

¶ 63                                                III. CONCLUSION

¶ 64                For the reasons stated, we affirm the judgment of the trial court.

¶ 65                Affirmed.